PAUL S. MARKS, State Bar No. 138407
    pmarks@neufeldmarks.com
**NEUFELD MARKS**
  **A Professional Corporation**
250 E. 1st Street, Suite 1101
Los Angeles, California 90012
Telephone:   (213) 625-2625
Facsimile:    (213) 625-2650

Attorneys for plaintiff David Cohen

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

| | |
|---|---|
| DAVID COHEN, an individual, | Case No. |
| Plaintiff, | COMPLAINT FOR |
| vs. | |
| JASON BOKOR, an individual; ALEX HUWE, an individual; REIMUND DANN, an individual; PIOONIER INTERNATIONAL, a foreign entity of unknown form, | 1. **FRAUD AND DECEIT;**<br>2. **BREACH OF CONTRACT;**<br>3. **BREACH OF FIDUCIARY DUTY;**<br>4. **INTENTIONAL INTERFERENCE WITH CONTRACT;**<br>5. **ACCOUNTING; AND**<br>6. **PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF** |
| Defendants, | |
| and | |
| PIOONIER GROUP, LLC, a Delaware limited liability corporation, | |
| Nominal Defendant. | |

## **COMPLAINT**

Plaintiff David Cohen alleges as follows:

## **PARTIES**

1.      Plaintiff DAVID COHEN ("Plaintiff") is, and at all times herein was, an

individual residing in Los Angeles County, and a citizen of the State of California.

2.      Defendant JASON BOKOR ("Bokor") is and at all times herein was an individual residing in, and a citizen of, Canada.

3.      Defendant ALEX HUWE ("Huwe") is and at all times herein was an individual residing in, and a citizen of, Germany.

4.      Defendant REIMUND DANN ("Dann") is and at all times herein was an individual residing in, and a citizen of, Germany.

5.      Plaintiff is informed and believes, and based thereon alleges, that Defendant PIOONIER INTERNATIONAL ("PG INT'L") is, and at all times herein was, a foreign business entity, the principal place of business and citizenship for which is believed to be located in Bulgaria.

6.      Nominal Defendant PIOONIER GROUP, LLC ("PG LLC") is, and at all times herein was, a Delaware limited liability company, with its principal pace of business in California.  PG LLC is a start-up entity having a business plan for the manufacture, marketing, and sale of recycled plastic railroad tie products.

7.      Plaintiff brings this action in his individual capacity as well as in his derivative capacity as a member of PG LLC, for the benefit of PG LLC.  This Honorable Court has original jurisdiction over this matter pursuant to 28 U.S.C. section 1332(a)(2), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.  Venue is proper in this Court in that plaintiff is a resident within the Central District of California and, *inter alia*, fraudulent conduct was directed toward him in this District.

8.      Plaintiff is informed and believes, and based thereon alleges, that, except as otherwise alleged herein, each of the defendants is and at all relevant times was the agent, employer, partner, joint venturer, aider and abettor, alter ego, and/or affiliate of each of the other defendants and, in doing the things alleged herein, were acting within the course and scope of such positions at the direction of and/or with the permission, knowledge, consent and/or ratification of each of the other defendants.

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

9.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant herein, defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing the acts complained of herein, acting pursuant to a conspiracy in order to induce Plaintiff to provide funds and services to defendants so they could use the funds for their own benefit and to the detriment of Plaintiff.

## **GENERAL ALLEGATIONS**

10.     In or about 2022, Plaintiff and Bokor, Dann, Huwe and PG Int'l created a business plan for their company, PG LLC, which was to establish a series of manufacturing plants in the United States similar to an existing manufacturing facility in Magdeburg, Germany, that is owned and has been utilized by PG INT'L for several years.

11.     The goal of the project was to have PG LLC compete with manufacturers of steel, wood, and concrete railroad ties, also known as "sleepers," with the more durable, longer-lasting composite ties being manufactured in Germany by PG INT'L, which have for years been successfully used throughout Europe.  For various business and international trade reasons, the manufacture and distribution of these ties in the United States would enable these products to be distributed to a much larger US and Canadian market and sold domestically and worldwide on a more profitable basis.

12.     Since the inception of PG LLC, Plaintiff has been the Manager, Chief Executive Officer, and an LLC member of the company.  PG LLC's operating agreement is dated October 6, 2022 ("Operating Agreement"), a true and correct copy of which is attached hereto as Exhibit A and incorporated herein by reference.

13.     Bokor is the other Manager of PG LLC, as well as a member.

14.     Huwe and Dann are general managers of PG INT'L; PG INT'L is the third member of PG LLC.  PG INT'L licensed and assigned certain United States patents it owned to PG LLC, when it became a member in October 2022.

15.     Plaintiff himself spearheaded and organized each of the various initiatives required to get the PG LLC project off the ground, while Bokor, who was and is relatively

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

inexperienced in business matters, took directions in all matters from Plaintiff.

16.     Plaintiff was committed to the success of the project, and invested $50,000 in PG LLC.  Plaintiff worked for PG LLC for about a year and a half, and during that time he received no compensation; he paid for his own travel and related expenses for his work at PG LLC with his own funds including payment of all company expenses and overhead; and even compensated Bokor with his own money at a time when Bokor was cash-strapped.

17.     Bokor, meanwhile, failed to invest his $50,000 in PG LLC, as required by the Operating Agreement.

18.     During the time he was affiliated with PG LLC, Plaintiff worked on the project more than full time, and engaged in the following activities, among others:

    a.   Initiating promotions and sales lead with various entities in the rail industry;

    b.   Entering into nondisclosure agreements with various entities in the rail industry;

    c.   Seeking up to $100,000,000 in financing required for the project, with various funding sources;

    d.   Devoting countless hours assuring regulatory compliance for the subject products; and

    e.   Engaging in all other tasks required to successfully manage a start-up manufacturing company in the United States.

19.     Plaintiff's efforts were highly successful in creating a company that was on the verge of a bright and profitable future.  Plaintiff's tireless efforts resulted in the development of PG LLC's brand in the United States, Canada, Australia, Japan and other international markets, such that the name "Pioonier" is now recognized and respected in the rail industry in those countries.   In addition, under Plaintiff's leadership, PG LLC conducted on-track testing and installation with at least three large rail companies in the

1   United States, Canada, and Australia, securing initial purchase orders and various Letters

2   of Intent.

3       20.     Plaintiff is informed and believes, and based thereon alleges, that Bokor,

4   Huwe, Dann, and PG INT'L, together with Does 1 through 25, schemed and conspired

5   with each other to oust Plaintiff from PG LLC, and to wrongfully take for themselves all

6   of the benefits and profits derived from Plaintiff's investment in PG LLC, including his

7   funds, efforts, and services.  Each of these above-named defendants owned, operated,

8   and controlled the conspiracy and fraudulent schemes, and/or were materially aiding

9   other personnel in coordinating efforts to further their fraudulent schemes against

10  Plaintiff and to perpetrate a continuing fraud against Plaintiff.

11      21.     Bokor and PG INT'L are required to act in accordance with the Operating

12  Agreement.  That agreement states that Plaintiff and Bokor are the sole Managers who

13  shall act by majority consent, where each has one vote, and that the two Managers are

14  "solely responsible for the management of PG LLC and its business," and that they "have

15  the full and exclusive right to control, manage and make all decisions regarding the

16  business, property and the affairs of the Company."  (Operating Agreement at § 3.01(a).)

17      22.     The Operating Agreement also states that "[t]he Members do not have any

18  voting or approval rights under this Agreement."  (Operating Agreement at § 3.03.)

19      23.     Despite these express requirements of the Operating Agreement, on

20  January 31, 2024, Bokor and PG INT'L, through Huwe and Dann, purported to remove

21  Plaintiff as Manager and Chief Executive Officer of PG LLC.  This legally ineffective action

22  was purportedly achieved pursuant to a Written Consent for Action Taken by Majority-

23  in-Interest of Members of the Company, a copy of which is attached hereto as Exhibit B

24  and incorporated herein by reference.   Bokor, PG INT'L, Huwe, and Dann then without

25  any notice abruptly and wrongfully shut down Plaintiff's PG LLC email account, and

26  prevented Plaintiff from accessing any corporate data and communications of PG LLC.

27      24.     Pursuant to the Operating Agreement, the purported removal action by

28  Bokor, PG INT'L, Huwe, and Dann has no effect on Plaintiff's status in PG LLC as its

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625   •   Facsimile: (213) 625-2650

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

1  Manager and Chief Executive Officer; as a legal matter, Plaintiff continues in those roles

2  to this day.

3       25.    In furtherance of defendants' conspiracy and fraudulent schemes, PG INT'L,

4  Huwe, and Dann served a letter dated January 25, 2024 to PG LLC, which letter purports

5  to revoke PG INT'L's patent assignment agreement to PG LLC.  The patent assignment

6  agreement was dated October 2022, and it allowed for revocation of such assignments

7  if PG LLC did not purchase a composite sleeper processing system within one year of

8  the agreement.  However, at the time of that agreement, PG INT'L represented to PG LLC

9  that its composite ties, for which it held the subject United States patents, either met or

10 exceeded US Class I rail metrics, as set forth by The American Railway Engineering and

11 Maintenance of Way Association ("AREMA").  That organization establishes precise rules

12 and testing requirements related to the design and specific performance of cross ties and

13 switch ties, for approval of use in North America.  However, unbeknownst to Plaintiff and

14 PG LLC, the representations by PG INT'L regarding regulatory compliance were false.

15      26.    Plaintiff relied on PG INT'L's false representations as referenced above, and

16 proceeded with his efforts to move forward with the project.  In fact, in anticipation of

17 securing its financing, PG LLC did timely place an order for the purchase of a composite

18 sleeper processing system, mutually executed by PG LLC and PG INT'L dated August 15,

19 2023.  However, once Plaintiff found out about the falsity of PG INT'L's representation

20 regarding regulatory compliance and the requirement for US metrics approval, he was

21 forced to sidetrack many of his efforts to move the project forward because he was

22 required to locate, retain, work with, and pay -- using his own funds -- MxV Rail, a

23 subsidiary of the Association of American Railroads, to test and re-test the composite ties

24 and assure that they could, in fact, be lawfully used within the United States.  MxV Rail's

25 testing, evaluation, and approval of the subject railroad ties only came on October 23,

26 2023.

27      27.    Because of PG INT'L's misrepresentations and/or material omissions about

28 regulatory compliance issues, at the very least, the one-year period for revocation of the

1  patent assignments did not become operative until October 23, 2023.  This rendered the

2  purported revocation by PG INT'L wholly ineffective.

3       28.    In furtherance of defendants' conspiracy and fraudulent schemes, Bokor,

4  PG INT'L, Huwe, and Dann purported to dissolve PG LLC, and on or about January 26,

5  2024, Bokor and PG INT'L, through Huwe and Dann, entered into an agreement for

6  PG INT'L to sell its goods only to Bokor, among other things.  This agreement is in direct

7  contravention of the Operating Agreement, which expressly prohibits any members or

8  affiliates from engaging in any competitive business in relation to PG LLC without the

9  prior written consent of the Managers.  (Operating Agreement at § 3.04(c).)

10      29.    Demands were made to defendants to rectify their conduct, and defendants

11 refused them.  Further, given the fraudulent, wrongful and bad faith conduct of Bokor,

12 PG INT'L, Huwe, and Dann as referenced above, any such demands by Plaintiff to redress

13 and rectify the wrongs and injuries that they have caused to PG LLC and to Plaintiff were,

14 are, and would have been futile as a matter of law.

15      30.    Based on the actions of Bokor, PG INT'L, Huwe, and Dann, and Does 1 to 50,

16 as referenced above, Plaintiff has been damaged in an amount to be proven at trial, but

17 not less than $625,000 for monetary compensation for the services he performed over

18 the last fifteen months on behalf of PG LLC; tens if not hundreds of millions of dollars in

19 lost profits and future compensation; and reimbursement of out-of-pocket expenses.

20 Plaintiff is also entitled to management fees for his services and reimbursement of his

21 costs and all out-of-pocket expenses expended on behalf of PG LLC pursuant to the

22 Operating Agreement.  (Operating Agreement at § 3.02(a), (b).)

23      31.    Plaintiff is also entitled to attorneys' fees in this action pursuant to the

24 Operating Agreement.  (Operating Agreement at § 12.10.)

### FIRST CAUSE OF ACTION

### (Fraud and Deceit – Against All Defendants)

27      32.    Plaintiff realleges and incorporates by this reference all previous

28 paragraphs above, as if set forth in full herein.

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625   •   Facsimile: (213) 625-2650

33.     The allegations set forth above constituted promissory fraud, intentional fraud, and fraud by omission.

34.     Plaintiff relied on the false promises, false representations, and omissions to provide truthful information, and his reliance was reasonable.  In so relying, Plaintiff continued to work tireless toward fruition of the PG LLC project; incurred well into the six figures in costs and expenses borne entirely by him, and was prevented from seeking alternative means of employment with other persons or entities.

35.     Plaintiff has been damaged as alleged herein, including but not limited to lost compensation; lost profits; unpaid expenses, and lost opportunity costs.  Said damages calculate to hundreds of millions of dollars.  Defendants, and each of them, are liable for said damages.

36.     Based on the conduct alleged herein, defendants, and each of them, are also liable for punitive and exemplary damages.  The unjustified and wrongful conduct of defendants was intentional, absolutely despicable, and committed with malice and oppression toward, and in conscious disregard of, Plaintiff's rights and needs, and has subjected Plaintiff to unjust hardship.  Plaintiff is therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of defendants for the wrongful conduct alleged herein.

## SECOND CAUSE OF ACTION

**(Derivative Claim - Breach of Contract – By PG LLC Against BOKOR and PG INT'L)**

37.     Plaintiff realleges and incorporates by this reference all previous paragraphs above, as if set forth in full herein.

38.     The actions of as set forth hereinabove, have harmed PG LLC.  Thanks to Plaintiff's extensive efforts, PG LLC was on the verge of highly profitable manufacture and sale of its products in the Unites States and abroad.

39.     Defendants Bokor, Huwe, and Dann, by their actions set forth above, have breached the operating agreement, have allegedly caused the company to be dissolved, and in any event have severely if not permanently damaged the operations, initiatives,

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1ˢᵗ Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

1  business relationships, and goodwill of PG LLC.

2      40.    Plaintiff sues derivatively for recompense of said damages to the entity.

3  Plaintiffs' demands have not succeeded in ending said defendants' plunder of PG LLC.

4  In any event, said demands were and are futile.

5  ### THIRD CAUSE OF ACTION

6  **(Derivative Claim - Breach of Fiduciary Duty – By PG LLC Against BOKOR)**

7      41.    Plaintiff realleges and incorporates by this reference all previous

8  paragraphs above, as if set forth in full herein.

9      42.    At all relevant times herein, Plaintiff and PG LLC reposed great trust and

10  confidence in Bokor as a managing member of PG LLC.

11      43.    At all relevant times herein, as a managing member of PG LLC, Bokor owed

12  the following fiduciary duties, responsibilities and obligations, among others, to Plaintiff

13  and PG LLC:

14      a.    To act for the benefit of PG LLC, in good faith, and in a manner

15          believed to be in the best interests of PG LLC and members such as

16          Plaintiff;

17      b.    To perform the duties as a managing member with such care,

18          including reasonable inquiry, as an ordinary prudent person in a like

19          position would use under similar circumstances;

20      c.    To avoid engaging in conduct characterized by an inherent conflict

21          of interest;

22      d.    To avoid using his position as a managing member of PG LLC for his

23          personal benefit at the expense of members such as Plaintiff;

24      e.    To be fair, honest and completely faithful in exercising the rights and

25          powers conferred by his position as a managing member; and

26      f.    To fully satisfy all other fiduciary responsibilities, including without

27          limitation the duty of loyalty that applies to managing members.

28

44.     Bokor failed to exercise the care required of him as a managing member of PG LLC.

45.     As a direct and proximate result of Bokor's breach of his fiduciary duty to PG LLC and Plaintiff, PG LLC and Plaintiff have been damaged in an amount to be proven at trial.

46.     The unjustified and wrongful conduct of Bokor in breaching his fiduciary duty was intentional, absolutely despicable, and committed with malice and oppression toward, and in conscious disregard of, PG LLC's and Plaintiff's rights and needs, and has subjected PG LLC and Plaintiff to unjust hardship.  PG LLC and Plaintiff are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of defendants for the wrongful conduct alleged herein.

## FOURTH CAUSE OF ACTION

### (Derivative Claim - Intentional Interference with Contract – By PG LLC Against All Defendants)

47.     Plaintiff realleges and incorporates by this reference all previous paragraphs above, as if set forth in full herein.

48.     Based on the foregoing allegations, defendants have caused harm to PG LLC by interfering with present and future contractual relationships of the business of PG LLC.

49.     As a direct and proximate result of defendants' conduct, PG LLC and Plaintiff have been damaged in an amount to be proven at trial.

50.     The unjustified and wrongful conduct of defendants was intentional, absolutely despicable, and committed with malice and oppression toward, and in conscious disregard of, PG LLC's and Plaintiff's rights and needs, and has subjected PG LLC and Plaintiff to unjust hardship.  PG LLC and Plaintiff are therefore entitled to an award of punitive damages, in an amount to be determined at trial, sufficient to make an example of defendants for the wrongful conduct alleged herein.

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

### FIFTH CAUSE OF ACTION

### (Accounting – Against Bokor and PG INT'L)

51.     Plaintiff realleges and incorporates by this reference all previous paragraphs above, as if set forth in full herein.

52.     Plaintiff alleges on information and belief that in the course of the affairs and operations of PG LLC, Bokor, PG INT'L, Huwe, and Dann prevented Plaintiff from accessing any corporate data and communications for PG LLC, and proceeded to take over PG LLC such that Bokor, PG INT'L, Huwe, and Dann maintained control over the books and records of the company, including the money and assets of PG LLC.

53.     Plaintiff made demands to Bokor, PG INT'L, Huwe, and Dann for an accounting and to pay him his management fees and reimbursement for costs owed to him, but they have failed and refused, and continue to fail and refuse, to render any accounting or pay Plaintiff the amounts due and owing to him.

54.     As a direct and proximate result of defendants' aforementioned conduct, Plaintiff hereby seeks an order for an accounting of the books and records of PG LLC from Bokor, PG INT'L, Huwe, and Dann and for payment to Plaintiff due from the defendants as determined by the accounting, plus interest thereon, and for attorneys' fees and costs.

### SIXTH CAUSE OF ACTION

### (Preliminary and Permanent Injunction– Against All Defendants)

55.     Plaintiff realleges and incorporates by this reference all previous paragraphs above, as if set forth in full herein.

56.     PG LLC, as well as Plaintiff, as a member of PG LLC, have been irreparably harmed and lack an adequate remedy at law.   Entry of a preliminary and permanent injunction is appropriate, prohibiting Bokor, PG INT'L, Huwe, and Dann from doing any or all of the following:

a.     Acting, or purporting to act, to dissolve PG LLC;

b.     Making any decisions or taking any action on behalf of PG LLC;

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

c.   Maintaining control of the books, records, financial accounts and other materials necessary to manage PG LLC;

d.   Using or authorizing the use of any monies, property or assets of PG LLC for any purpose;

e.   Engaging in any further violations of the Operating Agreement and any other law in all regards in connection with PG LLC;

f.   Interfering with the lawful operation of PG LLC.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all defendants, and each of them, as follows:

1.   For damages in an amount to be shown according to proof at trial, but in excess of $625,000;

2.   For special damages to be shown according to proof at trial;

3.   For pre-judgment interest as allowed by law;

4.   For punitive and exemplary damages;

5.   For a preliminary and permanent injunction;

6.   For reasonable attorneys' fees and costs;

7.   For costs of suit herein; and

8.   For such other and further relief as the Court deems proper.

DATED:  April 15, 2024                NEUFELD MARKS
                                       A Professional Corporation
                                      Paul S. Marks

By: _____
        Paul S. Marks
        Attorneys for plaintiff David Cohen

1

## **DEMAND FOR JURY**

2

     Plaintiff respectfully demands a jury trial in this matter.

3

4   DATED:  April 15, 2024         NEUFELD MARKS

5                         A Professional Corporation

Paul S. Marks

6

7

8                      By: _____

9                         Paul S. Marks

                         Attorneys for plaintiff David Cohen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625  •  Facsimile: (213) 625-2650

EXHIBIT  A

**PIOONIER GROUP, LLC**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**(A DELAWARE LIMITED LIABILITY COMPANY)**



**PIOONIER GROUP, LLC LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

This Limited Liability Company Operating Agreement (the "Agreement") is entered into as of October 6, 2022, by and among the signatories to this Agreement and is made with respect to the following facts:

A.      On October 5, 2022, the Articles of Organization of the Company was filed with the Secretary of State.

B.      The parties hereto desire to form a limited liability company pursuant to the provisions of the Act and in accordance with the following terms, conditions, privileges and restrictions.

NOW THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

**ARTICLE I DEFINITIONS**

1.01 <u>Definitions</u>.  As used in this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement, the following definitions shall apply.

"Accountant" means the Company's independent certified public accountant selected by the Managers in their discretion, which may also be an accountant for any of the Managers, Members or Economic Interest Owners.

"Act" means the means the Limited Liability Company Act of the State of Delaware.

"Adjusted Capital Account Deficit" means with respect to any Member or Economic Interest Owner, the deficit balance, if any, in the Capital Account of such Member or Economic Interest Owner as of the end of the taxable year, after giving effect to the following adjustments:

(a)      Credit to such Capital Account any amount which such Member or Economic Interest Owner is deemed to be obligated to restore under Section l.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections l.704-2(g)(l) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Section 1.704 2(i)(3) of the Treasury Regulations); and

(b)      Debit to such Capital Account the items described in Sections l.704l(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Adjusted Capital Account Deficit is intended to comply with the provision of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and 1.704-2 and will be interpreted consistently with those provisions.

"Affiliate" means (a) any Person directly or indirectly controlling, controlled by or under common control with another Person; (b) any Person owning or controlling 10% or more of the outstanding voting securities or interests of such other Person; (c) any officer, director, manager or general partner of such Person; or (d) if such other Person is an officer, director, manager, general partner, trustee or holder of 10% or more of the voting securities or interests, any entity for which such Person acts in any such capacity.

"Agreement" means this Limited Liability Company Operating Agreement as originally executed and as amended from time to time as the context requires.

"Appraiser" means an investment banker, appraiser or certified public accountant who has at least five (5) years' experience in the evaluation of closely held businesses and who is not affiliated in any way, directly or indirectly, with any of the parties hereto.

"Associate" of a Person means: (i) a corporation or organization of which such person is an officer or partner or is, directly or indirectly, the beneficial owner of 10% or more of any class of equity securities; (ii) any trust or other estate

1



in which such person has a substantial beneficial interest or as to which such person serves as a trustee or in a similar capacity; and (iii) any Relative of such person.

  "Articles of Organization" means the Articles of Organization of the Company as filed with the Secretary of State, as the same may be amended from time to time.

  "Available Cash" means, as of any date, the cash and cash equivalents, including borrowed funds, of the Company that the Managers determines may be distributed to the Members and Economic Interest Owners without violating any material credit or loan agreement of the Company and/or any Company Affiliate, after deducting therefrom the sum of (a) cash that the Managers determines is required for all expenses, liabilities and obligations of the Company and/or any Company Affiliate (whether for expense items, capital expenditures, improvements, retirement of indebtedness, loan to the Company or otherwise) and (b) reserves as established by the Managers for capital expenditures, improvements, retirement of indebtedness, operations, contingencies, liquidated or unliquidated, including, but not limited to, liabilities which may be incurred in litigation.

  "Bankruptcy" means, with respect to any Member or Economic Interest Owner, (a) an assignment for the benefit of creditors; (b) the filing of a voluntary petition in bankruptcy; (c) the entry of an order for relief in any bankruptcy or insolvency proceeding; (d) the filing of a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (e) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition against such Member or Economic Interest Owner in any proceeding of the foregoing nature; (f) the filing of an involuntary petition against such Member or Economic Interest Owner in any bankruptcy or insolvency proceeding which is not dismissed within ninety (90) days; or (g) if such Member or Economic Interest Owner seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of such Member or Economic Interest Owner or of all or a substantial part of its property.

                    "Blue Sky Law" means any state "blue sky" securities laws.

                      "Business Day" shall mean any day other than a Saturday, Sunday or other day on which banks in California are required to close.

  "Buy-Out Event" means any one of the following events: (i) the death, incapacity or bankruptcy of a Member; (ii) the resignation, retirement, withdrawal or dissociation of a Member from the Company; or (iii) the occurrence of any other event that is, or that would cause, a Disposition of a Membership or Economic Interest in contravention of this Agreement.

  "Buy-Out Purchase Price" shall be the Fair Market Value of the Membership or Economic Interests being purchased and sold upon the occurrence of a Buy-Out Event. The Fair Market Value shall be determined on the date of the occurrence of the Buy-Out Event as follows. After the exercise of the Buy-Out Right by the Electing Party, the Selling Member and the Electing Party shall forthwith attempt to agree upon the Fair Market Value for the Selling Interest. If the Selling Member and Electing Party are unable to agree upon the Fair Market Value of the Selling Interest, Fair Market Value shall be determined by an Appraiser unanimously approved by the Electing Party and the Selling Member. If the Electing Party and the Selling Member are unable to agree upon an Appraiser within thirty (30) calendar days after exercise of the Buy-Out Right, either the Selling Member or Electing Party may at any time thereafter submit the matter of appointing an Appraiser to binding arbitration in accordance with the terms of Section 12.13 hereof and the arbitrator shall select the Appraiser. The parties shall use their best efforts to cause the Appraiser to complete its valuation in writing within sixty (60) days of engagement. The Appraiser shall determine the Fair Market Value of the Selling Interest in accordance with the terms of this Agreement and he shall have no authority to alter or change its terms. Promptly after the selection of the Appraiser, the Electing Party and the Selling Member may each submit to the Appraiser (and to each other) a written statement of their position regarding the Fair Market Value of the Selling Interest and supporting arguments, and each shall be given a period of five (5) Business Days thereafter to submit to the other and to the Appraiser a written response to such written statement of the other. The Appraiser shall, within forty-five (45) days of the date of its selection, determine the Fair Market Value of the Selling Interest by choosing either the Fair Market Value of the Electing Party set forth in its statement or the Fair Market Value of the Selling Member set forth in its statement, whichever in the opinion of such Appraiser is more consistent with the purposes and intent of this Agreement. The Appraiser shall have no authority to make any change, amendment or revision in any party's position or to change or alter any of the provisions of this Agreement. The Appraiser shall promptly deliver a written decision with respect to the determination to each of the parties, who shall promptly act in accordance therewith. Each party agrees that any decision of the Appraiser shall be final, conclusive and binding and



that they will not contest any action by any other party thereto in accordance with a decision of the Appraiser.  It is specifically understood and agreed that any party may enforce any decision of the Appraiser pursuant to this this Section by bringing suit in any court of competent jurisdiction. One-half of the expenses and fees of the Appraiser shall be paid by the Electing Party and one-half by the Selling Member; provided that each party shall bear the expense of its own appraiser and in presentation of evidence to the Appraiser.

"Buy-Out Terms" means (a) a cash down payment equal to ten percent (10%) of the Buy-Out Purchase Price payable upon consummation of the purchase and sale of the Selling Interest, and (b) a promissory note of the Electing Party for the balance of the Buy-Out Purchase Price payable in quarterly installments over a period of five (5) years from consummation of the purchase and sale, which note shall bear simple interest at the rate of five (5%) per annum and be secured by the Selling Interest.

"Capital Account" means an account that shall be established and maintained for each Member and Economic Interest Owner as described in Section 4.04 hereof.

"Capital Contribution" means, for each Member and Economic Interest Owner, the amount set forth on Schedule "A" attached hereto for the Members and Economic Interest Owners named therein, plus any additional Capital Contributions made by that Member, Economic Interest Owner or any other Member or Economic Interest Owner to the Company.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means Pioonier Group, LLC, the Delaware limited liability company created pursuant to the Articles of Organization and this Agreement.

"Company Affiliate" means the Company and any other entity whose voting equity is "beneficially owned" more than fifty percent (50%) by the Company.  "Beneficially owned" shall mean a beneficial owner within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended and interpreted by the Securities Exchange Commission.

"Company Minimum Gain" has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"Competitive Business" means any Member or Economic Interest Owner directly or indirectly through an Affiliate, Associate or otherwise, doing any of the following acts anywhere in the Geographic Area, either individually, in partnership, jointly or in conjunction with any other Person, without the prior written consent of the Managers, which may be given or withheld within their sole discretion: (a) engaging or participating in the Business anywhere in the Geographic Area; (b) being otherwise financially interested either as an equity participant, a lender, a guarantor or an agent in the Business anywhere in the Geographic Area; provided, however, that nothing contained in this Section shall be deemed to prohibit Seller, Stockholder or their Affiliates or Associates from acquiring in the aggregate a one percent (1%) legal and beneficial ownership, solely as an investment through market purchases, of securities of any corporation which are registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended, and which are publicly traded so long as he, it or they are not part of any control group of such corporation; (c) being employed by, consulting with or advising any Person engaged in the Business anywhere in the Geographic Area; or (d) authorizing or voluntarily permitting its name or any part thereof to be used or employed by any Person in the Business anywhere in the Geographic Area.

"Contract" shall mean any agreement, contract, commitment, indenture, lease, license, instrument, note, bond, security, agreement in principle, letter of intent, undertaking, promise, covenant, arrangement or understanding, whether written or oral.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such fiscal year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

3

"Dispose of," when used with reference to any Membership or Economic Interest, shall mean to directly or indirectly, voluntarily or involuntarily, (a) sell, assign, make a Gift of, exchange, pledge, hypothecate, grant an option or other right for or otherwise transfer (whether by merger or otherwise), encumber or subject to any claim, lien or restriction any such Membership or Economic Interest or any interest therein, or (b) grant any voting or other rights with respect to any such Membership Interest.  The terms "Disposition," "Disposing of" and similar variants shall have correlative meanings.  Without limiting the generality of the foregoing:

(i)        In the case of any Membership or Economic Interest held by a Person which is an entity, (A) any merger, consolidation, binding share exchange or similar transaction to which such entity is a party and in which such entity is not the surviving or continuing entity shall be deemed to be a Disposition of all of such Membership or Economic Interest; and (B) any issuance by such entity of any shares of capital stock of or other equity interests in such entity or any rights with respect to any of the foregoing (including any such issuance in connection with any merger, consolidation, binding share exchange or similar transaction to which such entity is a party and in which such entity is the surviving or continuing Entity), or any Disposition by any entity who holds any capital stock of or other equity interests in such entity of any such capital stock or other equity interests or of any rights with respect thereto, shall in each case be deemed to constitute a Disposition of a number or amount of shares or other appropriate units of Membership or Economic Interest (the "Transferred Interest") held by such Person equal to the product of the total number or amount of shares or other appropriate units of Membership or Economic Interest held by such Person multiplied by the percentage of all outstanding assumed equity interests in such entity (after giving effect to such issuance or Disposition of capital stock or other equity interests and the assumed exercise, exchange or conversion of all rights, if any, included in such equity interests) represented by such equity interests issued or Disposed of (the "Transferred Equity Interests"), and, for purposes of this definition the aggregate consideration for all such Transferred Interest shall be deemed to be the product of (x) the percentage of the Fair Market Value of all such outstanding equity interests in such entity represented by the Fair Market Value of all Membership or Economic Interest held by such entity, multiplied by (y) the amount of consideration proposed to be paid for such Transferred Equity Interests (including, in the case of rights, any additional consideration payable upon the exercise, exchange or conversion thereof);

(ii)       Any redemption, purchase or other acquisition in any manner (whether or not for any consideration) by the Company or any Company Affiliate of any Membership or Economic Interest shall be deemed to be a Disposition of such Membership or Economic Interest; and

(iii)      The failure to exercise, exchange or convert any rights to subscribe for, purchase or otherwise acquire any Membership or Economic Interest before the expiration or other termination of such rights shall be deemed to be a Disposition of such rights and the Membership or Economic Interest which would have been issuable or deliverable if such rights had been exercised, exchanged or converted immediately prior to such expiration or other termination.

For purposes of this Agreement, any Disposition or issuance or proposed Disposition or issuance of any rights shall also constitute a Disposition or issuance or proposed Disposition or issuance of the underlying Membership or Economic Interest.  Without limiting the generality of the immediately preceding sentence, any Disposition or proposed Disposition at any time by any Member of any right which is exercisable or exchangeable for or convertible into any Membership or Economic Interest shall be deemed for all purposes of this Agreement to be a Disposition or proposed Disposition of the maximum number or amount of interests determined as of such time, which would be issuable or deliverable upon the exercise, exchange or conversion of such right, whether or not such right is then exercisable, exchangeable or convertible.

"Economic Interest" means a Member's or Economic Interest Owner's share of the Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include, unless the Person purchasing or otherwise acquiring such Economic Interest was a Member immediately prior to its purchase or other acquisition of the Economic Interest, any other rights of a Member including, without limitation, the right to participate in the management or affairs of the Company, the right to vote on, consent to or otherwise participate in any decision of the Members, and except as set forth in Section 8.01 hereof, any right to information concerning the business or affairs of the Company.

"Economic Interest Owner" means the owner of an Economic Interest who is not a Member; provided, however, that if a Person is a Member immediately prior to its purchase or other acquisition of an Economic Interest, such Person shall have all the right of a Member with respect to such purchased or otherwise acquired Economic Interest.

4

"Effective Date" means the date of this Agreement.

"Employee" means (i) any individual who is an employee of the Company or any of its Affiliates and (ii) any individual who is retained as an independent contractor by the Company and performs functions similar to an employee.

"Fair Market Value" shall mean the price at which a willing seller would sell and a willing buyer would buy such property having full knowledge of the facts, in an arm's-length auction transaction without time constraints, and without being under any compulsion to buy or sell. Fair Market Value, in the case of the Company, shall be determined by using standard appraisal techniques in use at the time, the market interest rates and economic factors then relevant, by including the amount of the Company's cash, by valuing all of the Company's other property, assets and businesses, if any, and by reducing that value by the aggregate amount of (a) all normal and customary expenses, fees and commissions that would have been incurred in a sale of such properties, assets and/or businesses at their appraised value (i.e., selling commissions, closing expenses, escrow fees, legal and accounting fees, etc.) and (b) all of the debt and other obligations of the Company ("Company Value"). In determining the Fair Market Value of any Membership or Economic Interest, the valuation will be based upon the amount of the Company Value that would be distributed to the Member or Economic Interest Owner under the terms of this Agreement.

"Finally Adjudicated" means an adjudication by a court of competent jurisdiction that is no longer appealable due to the passage of time or otherwise, and with respect to which a final judgment has been entered on the judgment roles of the court in which the action was commenced.

"GAAP" means generally accepted accounting practices set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination and are applied in a manner consistent with prior periods.

"Geographic Area" means worldwide except those countries in the European Union, which includes Austria, Belgium, Bulgaria, Croatia, Republic of Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain and Sweden.

"Gift" means a gift, bequest or any other assignment, transfer, encumbrance, pledge, lien, disposition, alienation or hypothecation for no consideration whether or not by operation of law, except in case of Bankruptcy.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)      The initial Gross Asset Value of any asset contributed by a Member or Economic
Interest Owner to the Company shall be the gross fair market value of such asset, as determined by the Managers, provided that the initial Gross Asset Values of the original Capital Contributions to the Company shall be as set forth on Schedule "A" attached hereto.

(b)      The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Section 7701(g) of the Code into account), as determined by the Managers as of the following times: (i) the acquisition of an additional interest by any new or existing Member or Economic Interest Owner in exchange for more than a de minimis contribution of property (including money); (ii) the distribution by the Company to a Member or Economic Interest Owner of more than a de minimis amount of property as consideration for a Membership or Economic Interest; and (iii) the liquidation of the Company within the meaning of Treasury Regulations Section l.704-l(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Managers determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members and Economic Interest Owners in the Company;

(c)      The Gross Asset Value of any Company asset distributed to any Member or

5



Economic Interest Owner shall be adjusted to equal the gross fair market value (taking Section 7701(g) of the Code into account) of such asset on the date of distribution as determined by the Managers;

(d)      The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section l.704-l(b)(2)(iv)(m) and Section 4.04(d) of this Agreement and Subparagraph (d) under the definition of Profits and Losses; provided, however, that Gross Asset Values shall not be adjusted pursuant to this definition to the extent the Managers determines that an adjustment pursuant to Subparagraph (b) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (a), (b) or (d) of this definition, then such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Gross Receipts" means the Company's gross or total amount of all receipts or collections from all sources without any deduction therefrom.

"Indemnitee Loss" means, with respect to any Person, any and all loss, damage, liability, cost, penalty and expense actually and reasonably incurred by such Person in connection with a Proceeding for which a Person has not otherwise been reimbursed by the Company, including, without limitation, the fees and expenses of attorneys, accountants and other professionals and costs, judgments, fines and amounts paid in settlement thereof.

"Managers" means David Cohen, and Jason Bokor. The Managers shall act by majority consent, where each of the said individuals shall have one vote.

"Majority-in-Interest" of the Members means such Members holding an aggregate Voting Percentage equal to more than fifty percent (50%) of the Voting Percentage of all Members included in the specified group.

"Member" shall have the meaning set forth in the Act and shall include each of the parties who executes a counterpart of this Agreement as a Member and each of the parties who may hereafter become Members for so long as each such Person remains a Member. If a Person is a Member immediately prior to its purchase or other acquisition of a Membership Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest.

'Member Minimum Gain" means an amount with respect to each Member Nonrecourse Debt equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(2).

"Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall have the meaning set forth in Regulations Section 1.7042(i). The amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Company Fiscal Year equals the excess, if any (a) of the net increase, if any, in the amount of the Company Minimum Gain attributable to such Member Nonrecourse Debt during that Fiscal Year, over (b) the aggregate amount of any distributions during such year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent such distributions are from proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Gain attributable to such Member Nonrecourse Debt, determined according to the provisions of Regulation Section 1.704-2(i).

"Membership Interest" means a Member's limited liability company interest in the Company including, without limitation, a Member's Profit Units, Profits Interest, Voting Percentage, Economic Interest, rights in specific Company property, interest in the Company, right to participate in the management of the Company and the right to information concerning the business and affairs of the Company provided in this Agreement and the Act.



"Nonrecourse Debt" has the meaning given to the term "nonrecourse liability" by Regulations Section 1.704-2(b)(3).

"Nonrecourse Deductions" shall have the meaning, and the amount thereof shall be, as set forth in Regulations Section 1.704-2(c). The amount of Nonrecourse Deductions for a Company fiscal year equals the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that Fiscal Year, over the aggregate amount of any distributions during that Fiscal Year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain, determined according to the provisions of Regulations Section 1.704-2(c). "Permitted Transferee" means with respect to any Person: (a) the Company; (b) any Member; (c) a stockholder or wholly-owned subsidiary of a Member or Economic Interest Owner (if such Member or Economic Interest Owner is a corporation), partner of a Member or Economic Interest Owner (if such Member or Economic Interest Owner is a partnership) or member of a Member or Economic Interest Owner (if such Member or Economic Interest Owner is a limited liability company), provided that the Person has been a stockholder, partner or member of the Member or Economic Interest Owner for at least twelve (12) months and all of the stockholders, partners or members of such Person qualify under clauses (b), (c) or (d) herein; and (d) if the Member or Economic Interest Owner is an individual, a Relative of the Member or Economic Interest Owner or a trust for the benefit of the Member, Economic Interest Owner or any other Person described in this definition.

"Person" means any individual, joint venture, partnership, limited liability company, corporation, association, trust, estate or any other entity. "Person" shall also include, where the context so permits, the heirs, executors, administrators, legal representatives, successors and assigns of such Person.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Company).

"Profits" and "Losses" mean, for each taxable year of the Company, an amount equal to the Company's net taxable income or loss for such year as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Company and in accordance with Section 703 of the Code with the following adjustments:

(a)     Any income of the Company described in Section 705(a)(1)(B) of the Code that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be added to such taxable income or loss;

(b)     Any expenditure of the Company described in Section 705(a)(2)(B) (or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i)) and Section 709 of the Code and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to clause (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain (if the adjustment increases the Gross Asset Value of the asset) or loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset for purposes of computing Profits and Losses;

(d)     Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year, computed in accordance with the definition of Depreciation;

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Membership or Economic Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment

7

increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(g)    Notwithstanding any other provision of this definition, any items which are specifically allocated pursuant to Section 5.05 and 5.06 of this Agreement shall not be taken into account in computing Profits and Losses.

"Profit Units" means the units in the Company which are used to calculate the Profits Interest of each Member and Economic Interest Owner.  As of the Effective Date and after the issuance of the Units contemplated hereby, there will be an aggregate of ONE THOUSAND (1,000) Profit Units issued and outstanding, which number may be increased as provided in Section 4.07 hereof and the other provisions of this Agreement.

"Profits Interest" means, and the Profits Interest of each Member and Economic Interest Owner will be, a percentage which shall be calculated by dividing the aggregate number of Profits Units held by such Member or Economic Interest Owner at the time such percentage is determined by the aggregate number of all of the Profits Units issued and outstanding at such time.  The Profits Interest of each Member and Economic Interest Owner as of the date hereof is set forth on Schedule "A" attached hereto, which shall be adjusted pursuant to, or in accordance with, Section 4.07 hereof and the other provisions of this Agreement.

"Pro Rata Share" means a percentage equal to the relative Profits Interest owned by the Member or Economic Interest Owner immediately prior to the measuring event.

"Relative" means an individual's parents, children, siblings and spouse, the parents and siblings of such person's spouse and the spouses of such person's children and siblings.

"Sale" or "Sell" means sell, assign, transfer, exchange, encumber, pledge, lien, hypothecate or other disposition or alienation for consideration.

"SEC" means the Securities and Exchange Commission.

"Secretary of State" means the Secretary of State of the State of Organization.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"State of Organization" means the State of Delaware.

"Target Balance" means, with respect to any Member as of the close of any period for which allocations are made hereunder, the amount such Member would receive (or be required to contribute) in a hypothetical liquidation of the Company as of the close of such period, assuming for purposes of such hypothetical liquidation: (a) a sale of all of the assets of the Member at prices equal to their then Gross Asset Values (taking into account only those revaluations of Gross Asset Values actually made by the Members prior to such hypothetical sale); and (b) the distribution of the net proceeds thereof to the Members pursuant to Section 10.03 (after the payment of all actual Company indebtedness, and any other liabilities related to the Company's operations and assets, limited, in the case of nonrecourse liabilities, to the collateral securing or otherwise available to satisfy such liabilities).

"Taxable Income" means the taxable income of the Company as reported on its federal return including separately stated items.

"Transferee" means a purchaser, assignee, transferee, vendee, successor, donee, pledgee, hypothecate or any Person who acquires all or any portion or a Membership or Economic Interest or any interest therein.

"Treasury Regulations" include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing of the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

"Unreturned Capital Contributions" for each Member shall mean the excess of the Capital Contributions made by such Member over the aggregate amount of all distributions made to such Member pursuant to Sections 5.02 hereof at the time of calculation.

"Voting Percentage" means, and the Voting Percentage of each Member and Economic Interest Owner will be, the same percentage as the Profits Interest of each such Member or Economic Interest Owner.

"Withdrawal Event" means the death, retirement, resignation, expulsion, Bankruptcy or dissolution of a Member or occurrence of any other event which terminates the continued membership of a Member in the Company.

1.02 <u>Terms Generally</u>. The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereof," "herewith" and "hereunder" and words of similar import refer to this Agreement in its entirety and not to any part hereof unless the context shall otherwise require. Unless otherwise expressly provided herein or the context shall otherwise require, any references to any agreement or other instrument (including this Agreement or any other agreement) or to any statute or regulation or any specific section or other provision thereof are to it as amended and supplemented from time-to-time (and, in the case of a statute or regulation or specific section or other provision thereof, to any successor of such statute, regulation, section or other provision). Any reference in this Agreement to a "day" or number of "days" (without the explicit qualification of "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice shall be deferred until, or may be taken or given on, the next Business Day.

ARTICLE II
ORGANIZATIONAL MATTERS

2.01 <u>Formation of the Company</u>.

(a) <u>Formation</u>. The Company was formed by the filing of the Articles of Organization with the Secretary of State in accordance with the Act. Should any provision of this Agreement be inconsistent with the Act, then such provision, and any action taken or occurring in connection with such provision, shall be deemed null and void ab initio.

(b) <u>Filing of Documents</u>. Upon and after the execution of this Agreement, the Managers shall take all actions necessary or advisable to maintain the Company as a limited liability company under the laws of the State of Organization, including the filing of all documents required by the Act.

(c) <u>Fictitious Business Name Statement</u>. Upon the execution of this Agreement, or upon a subsequent change in the membership of this Company, the Managers shall, if the Company is required to do so by applicable law, sign and cause to be filed and published in the county in which the principal place of business of the Company is situated a Fictitious Business Name Statement in accordance with the provisions of applicable law.

(d) <u>Foreign Qualification</u>. The Company will apply for authority to transact business in those jurisdictions where it is required to do so. The Company will file such other certificates and instruments as may be necessary or desirable in connection with its formation, existence or operation, such filings to be consistent with this Agreement.

2.02 <u>Name of the Company</u>. The name of the Company is "Pioonier Group, LLC." The business of the Company, however, may be conducted under any other name selected by the Managers who may change the name of the Company and shall promptly thereafter notify the other Members of such name change.

2.03 <u>Permitted Businesses</u>. The business of the Company shall be to (a) manufacture, market and sell recycled plastic railroad tie products (the "Business"); (b) engage in any other lawful activity for which a limited liability company may be organized under the Act and which is approved by the Managers; and (c) engage in all activities related to any of the foregoing and do all things necessary, in the Managers' judgment and not prohibited by this Agreement or any applicable Laws, to accomplish the foregoing purposes of the Company. The Company may conduct business through one or more subsidiaries.

9

2.04   <u>Term of the Company</u>.  The Company shall continue until the Company's Articles of Organization is cancelled as provided in the Act.

2.05   <u>Addresses</u>.

(a)   <u>Registered Office</u>.  The address of the registered office of the Company is set forth in the Articles of Organization.  The Company's principal place of business shall be determined by the Managers.

(b)   <u>Members' and Economic Interest Owners' Addresses</u>.  The names and addresses of the Managers and the other Members and Economic Interest Owners are set forth on Schedule "A" attached hereto, which may be amended from time to time by the Managers upon receiving written notice of a change of address from a Member or Economic Interest Owner.

(c)   <u>Registered Agent</u>.  The name and address of the registered agent of the Company for service of process on the Company is set forth in the Articles of Organization or as otherwise determined by the Managers.

ARTICLE III
MANAGEMENT OF THE COMPANY

3.01   <u>Management of the Company by the Managers</u>

(a)   Subject to the restrictions set forth in this Agreement, the Managers shall (i) be the Managers of the Company as permitted in the Act; (ii) be solely responsible for the management of the Company and its business; (iii) have all rights and powers generally conferred by the Act and/or law, or which shall be necessary, advisable or consistent in connection therewith or in connection with accomplishing the purpose of the Company as set forth in Section 2.03 hereof; and (iv) have the full and exclusive right to control, manage and make all decisions regarding the business, property and the affairs of the Company.  Except where a provision of this Agreement specifically qualifies that the Managers shall be subject to a reasonability standard, all actions, approvals, consents and/or decisions of the Managers under or in connection with this Agreement shall be within their sole and absolute discretion.

(b)   Notwithstanding that it may constitute a conflict of interest, the Managers may, and may cause its Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease or exchange of any property, the rendering of any service or the establishment of any salary, other compensation or other terms of employment) with the Company so long as the Managers reasonably believes that the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company.

3.02 <u>Affiliate Transactions</u>.  The Company may enter into any agreement with a Manager, Managers, Member and/or its Affiliates, and a Manager, Managers, Member and/or its Affiliates may receive any fee, compensation or payment from the Company, approved by the Managers as provided in Section 3.01(b) hereof.  The Managers, at its option, may cause any or all of the following fees or payments to be paid by any subsidiary of the Company directly to the Person entitled thereto rather than by the Company.  The agreements, payments and compensation of the Manger and/or its Affiliates set forth in this Section are hereby approved by the Managers and Members.  The Managers, at their option, may cause any or all of the following fees or payments to be paid by any subsidiary of the Company directly to the Person entitled thereto rather than by the Company.

(a)   <u>Management Fee</u>.  During the term of the Company, the Managers and/or its Affiliates shall receive a management fee equal to four percent (4.0%) of the Gross Receipts of the Company and/or any of its subsidiaries without any deduction therefrom (the "Management Fee").

(b)   <u>Reimbursement of Expenses</u>.  The Managers and/or its Affiliates shall be entitled to charge to the Company, and/or any subsidiary of the Company, or be reimbursed by the Company and/or any subsidiary of the Company, for any and all reasonable out-of-pocket expenses incurred by any of them on behalf of and/or related to the Company and/or its subsidiaries, all as determined by the Managers within their sole discretion.

10

3.03    Restrictions on the Members and Others.  The Members shall not have any voting or approval rights under this Agreement.  Also, unless specifically authorized by this Agreement, no Member, Economic Interest Owner, attorney-in-fact, officer, employee or other agent of the Company shall have any authority to, and shall not without the consent of the Managers, make any commitments, enter into any agreement or incur any expenses or liabilities on behalf of the Company or convey, encumber or transfer any interest in Company property.

3.04    Duty of the Managers and Members and Restrictions on Other Business Interests.

(a)    Subject to Sections 3.04(b), 3.05 and 3.07 hereof, the Managers shall perform their duties as the manager in good faith, in a manner it reasonably believes to be in the best interests of the Company and its Members and with such care as an ordinarily prudent Person in a like position would use under similar circumstances. Except as provided in the previous sentence, the Managers shall not have any other fiduciary duty to the Company, its Members or Economic Interest Owners.

(b)    Each Managers, Member, and/or any Affiliate thereof, has a fiduciary duty of loyalty to the Company and the Company shall have a prior claim to opportunities of business and profit which may be regarded as incident to its permitted business as provided in Section 2.03 hereof.  Notwithstanding the foregoing sentence to the contrary, the fiduciary duty of the Managers, Member and/or any Affiliate thereof with respect to any specific matter and/or the claim of the Company to any specific opportunity may be waived by the vote or consent of the Managers or a Majority-in-Interest of the Members.

(c)    Each Member and/or any Affiliate thereof does each hereby covenant and agree that it shall not, directly or indirectly through an Affiliate, Associate or otherwise, (i) engage in any Competitive Business anywhere in the Geographic Area, either individually, in partnership, jointly or in conjunction with any other Person, without the prior written consent of the Managers, which may be given or withheld within its so discretion; (ii) call on, solicit or induce any Employee to leave the Company or any of its Affiliates, or to accept any other employment or position, unless the Employee has been terminated by the Company or its Affiliate or has resigned as an Employee of the Company or its Affiliate, in each case more than one (1) year prior to such call, solicitation or inducement; (iii) assist any other Person in hiring any Employee of the Company other than by furnishing employment data and recommendations when solicited by potential employers; or (iv) disparage the Company, any of its Affiliates and/or any of their officers, directors, equity holders, members, Managers, products or services. The obligations of each Member under this Section 3.04(c) shall survive for so long as such Member remains a Member and for a period of two (2) years following the earlier of (1) termination, dissolution, liquidation and winding up of the Company, (2) the dissociation of such Member from the Company, or (3) such Member's Transfer of its Membership Interests. Each Member and/or any Affiliate thereof does each hereby covenant and agree that (A) irreparable damage would occur to the Company if any of the provisions of this Section 3.04(c) were not performed in accordance with their specific terms or were otherwise breached, and (B) the Company shall be entitled to one or more injunctions or restraining orders or both to prevent breaches of this Section and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which it is entitled at law or in equity.  Each covenant contained herein shall be construed as a separate covenant covering each separate county in the Geographic Area. If any court of competent jurisdiction determines that any covenant or provision contained herein, or any part thereof, is invalid or unenforceable, the remaining covenants and provisions shall not thereby be affected and shall be given full effect, without such invalid covenant or provision. If any court determines that any covenant or provision contained herein, or any part thereof, is unenforceable because of the duration of such provision or the area covered thereby, such court shall have the power to reduce the duration or area of such provision and, in its reduced form, such provision shall then be enforceable and shall be enforced.

3.05    Liability of the Managers and Members.

(a)    Notwithstanding any other provision of this Agreement to the contrary, the Managers, Members, and their manager, members, officers, directors, equity holders, agents, employees and Affiliates, shall not be liable, responsible or accountable, either jointly or severally, in damages or otherwise, to any of the Members, Economic Interest Owners or to the Company for any act performed by them, or for any omission or failure to act, except for acts performed by them which remained uncured for more than thirty (30) days after receipt by such Person of written notice thereof and which have been Finally Adjudicated to constitute fraud, bad faith or gross negligence. No act or omission to act on the part of any Managers, Member or its Affiliates shall be considered "willful" unless done, or omitted to be done, by them in bad faith and without reasonable belief that its act or omission was in the best interest of the Company.

(b)     The Managers may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties.

(c)     The Managers may consult with and employ counsel, accountants, appraisers, management consultants, investment bankers and other consultants, advisers and Persons selected by it (who may also serve as such for, and be employed by, any Managers or Member in matters unrelated to the Company, by the Company and/or any Affiliate thereof).  Any advice that the Managers receives from such Person as to matters which the Managers reasonably believes to be within its professional or expert competence shall be full and complete authorization and protection in respect to any action taken or suffered or omitted by the Managers hereunder in good faith and in accordance with such advice.

3.06    Indemnification of the Managers and Members.

(a)     To the fullest extent permitted by law, the Company shall indemnify and hold harmless each of the Managers, Members and their members, manager, equity holders, officers, directors, agents, employees and Affiliates (each, an "Indemnitee") who was or is a party or is threatened to be made a party to any Proceeding by reason of any act or omission or alleged act or omission (even acts or omissions constituting simple negligence) arising out of such Indemnitee's activities as the Managers, Member and/or as a member, manager, equity holder, officer, director, agent, employee or Affiliate of the Managers or Member from and against any and all Indemnitee Loss; provided, however, that such Indemnitee performed or omitted such acts in good faith and in a manner believed by such Indemnitee to be within the scope of the authority conferred by this Agreement, the Act and/or any other law or the consent of the Members and provided, further, that such act or omission does not constitute fraud, bad faith or gross negligence.

(b)     Except as provided in Section 3.06(a) hereof, each Indemnitee shall have the right to receive advances from the Company for all Indemnitee Loss incurred as a result of a Proceeding and all amounts for which such Indemnitee believes in good faith that it is entitled to indemnification under this Section 3.06; provided, however, that as a condition thereto, such Indemnitee shall, if required by the Company, provide an undertaking to repay to the Company all such Indemnitee Loss so advanced to the extent that it is Finally Adjudicated that such Indemnitee is not entitled to such indemnification.

(c)     The indemnification provided by this Section 3.06 shall be in addition to any other rights to which an Indemnitee may be entitled under any agreement, vote of the Members, as a matter of law or otherwise, both as to action in the Indemnitee's capacity as a Managers, Member or as an officer, director, equity holder, agent, employee or Affiliate of a Managers or Member and to action in another capacity, shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

3.07    Time Devotion by the Managers.  The Managers shall not be required to devote all of their time or business efforts to the affairs of the Company, but shall only devote such of their time, efforts and resources to the Company as it deems necessary or advisable.

3.08    Officers.

(a)     In General.  The Company may have such officers as designated by Managers within their sole discretion. The authority of officers will be limited by the restrictions and limitations set forth herein on the authority of the Managers.  The Company may have a chief executive officer and/or a president, a secretary, a chief financial officer, one (1) or more vice presidents, one (1) or more assistant secretaries, one (1) or more assistant treasurers and such other officers as may be appointed in accordance with the provisions of Section 3.08(d) hereof.  Any two (2) or more offices may be held by the same person.

(b)     Initial Officers.  The Managers shall elect officers as they deem appropriate.

(c)     Elections. The officers of the Company designated in Section 3.08(b) hereof shall be chosen by the Managers and serve at the pleasure of the Managers.

12

(d)    <u>Other Officers</u>. The Managers may appoint such other officers as the business of the Company may require, each of whom shall hold office for such period, have such authority and perform such duties as the Managers may from time to time determine.

(e)    <u>Removal and Resignation</u>. Subject to the terms of any applicable employment agreement, any officer may be removed with or without cause by the Managers and any officer may resign at any time upon written notice to the Company. Any such resignation shall take effect upon receipt of such notice or at any later time specified therein. If the resignation is effective at a future time, a successor may be elected to take office when the resignation becomes effective. Unless a resignation specifies otherwise, its acceptance by the Company shall not be necessary to make it effective.

(f)    <u>Vacancies</u>. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointments to the office.

(g)    <u>Compensation</u>. The officers of the Company shall not be entitled to compensation for serving as officers of the Company except to the extent authorized by the Managers.

ARTICLE IV
CAPITALIZATION

4.01    <u>Membership Interests, Contributions and Capital Accounts</u>. On or before the execution of this Agreement, each of the Members and Economic Interest Owners has made the Capital Contributions to the Company in the amount set forth opposite its name on Schedule "A" attached hereto.

4.02    <u>Membership Interests</u>. For making the Capital Contributions to the Company as set forth on Schedule "A" attached hereto, each Member shall receive the initial Membership Interest with the number of Profit Units and the initial Profits Interest set forth on Schedule "A" attached hereto.

4.03    <u>Right of First Refusal to Contribute Additional Cash</u>.

(a)    <u>Grant of Right of First Refusal to the Members and Economic Interest Owners</u>. If from time-to-time the Managers determines within its discretion that the Company needs money in addition to the Contributions set forth on Schedule "A" attached hereto and proposes that (i) the Company issue additional series limited liability company interest and/or any security that is convertible or exercisable for a such series of limited liability company interest in exchange for such money or (ii) the Company borrow any money from any Member, Economic Interest Owner or any of their Affiliates ("Additional Cash"), the Company hereby grants to each holder of the series limited liability company interest affected thereby as reasonably determined by the Managers ("Affected Member") the right of first refusal (the "Right") to contribute its Pro Rata Share of such Additional Cash pursuant to the terms set forth in this Section 4.03. Notwithstanding the foregoing to the contrary, the Right shall not apply to the issuance of any additional Membership Interests and/or any security that is convertible or exercisable for a Membership or Economic Interest in exchange for consideration other than cash or cash equivalents. The contribution of such Additional Cash to the Company pursuant to the provisions of this Section 4.03 is hereby expressly authorized by all of the Members and no vote or consent of any of the Members shall be required in connection with such contribution.

(b)    <u>Notice of Issuance</u>. If the Managers proposes to raise any Additional Cash, it shall deliver to the Affected Members written notice ("Issuance Notice") containing the following information: (i) description of the terms of the issuance, including, but not limited to, the class of Membership Interest affected, a description of the amount of interests to be issued, the purchase price thereof and the general terms and conditions upon which the Company proposes to issue them; and (ii) any other information the Managers may determine to include in its discretion.

(c)    <u>Exercise of Right</u>. Each Affected Member shall have fourteen (14) calendar days from the date of delivery of the Issuance Notice to agree to contribute up to its Pro Rata Share of such Additional Cash for the price and upon the same terms and conditions specified in the Issuance Notice. Such agreement shall be in writing stating therein the quantity of interests to be purchased (the "Notice of Exercise"). Upon the delivery of the Notice of Exercise, the Company and Member or Economic Interest Owner shall have entered into a binding agreement pursuant to which if

13

the Company raises any of the Additional Cash described in the Issuance Notice, which shall be within the Managers' sole discretion, the Member or Economic Interest Owner shall contribute the amount of the Additional Cash provided for in the Notice of Exercise (up to its Pro Rata Share) on the terms presented in the Issuance Notice.  If the Company does not receive the Notice of Exercise within such fourteen (14) day period, the Member or Economic Interest Owner shall have declined to exercise its Right and the Managers shall have one hundred eighty (180) days thereafter to issue the interests in respect of which the Member's or Economic Interest Owner's Right was not exercised, to such Persons selected by the Managers (including, without limitation, any Members who desire to fund in excess of their Pro Rata Share), at a price and upon general terms and conditions no more favorable to the purchasers thereof than those specified in the Issuance Notice.  If the Company has not issued the interests within such one hundred eighty (180) day period, thereafter the Company shall not raise any Additional Cash without first offering such interest to the Affected Members in the manner provided in this Section 4.03.  To the extent the terms specified in the Issuance Notice provide that any or all of the consideration to be received by the Company for the interests is not cash, then the fair market value of such non-cash consideration and such per interest amount shall be paid by the Member or Economic Interest Owner in cash.  If any Member contributes to the Company any property other than cash, the fair market value of such property shall be approved by the vote or consent of the Managers other than the Member(s) making the contribution.

4.04 <u>Capital Accounts</u>.  The Company shall maintain a separate Capital Account for each Member and Economic Interest Owner and such other accounts as may be necessary or desirable to comply with requirements of applicable law and the regulations thereunder.  The following provisions shall be observed in maintaining each Member's or Economic Interest Owner's Capital Account:

(a)     The Capital Account of each Member or Economic Interest Owner generally shall be credited with (i) the cash contributed to the Company by such Member or Economic Interest Owner; (ii) the Gross Asset Value of all property contributed by such Member or Economic Interest Owner to the Company (net of liabilities assumed by the Company, liabilities to which such contributed property is subject and/or liabilities the Company is considered to assume or take subject to under Section 752 of the Code); (iii) such Member's or Economic Interest Owner's allocable share of Profits (or items thereof) as properly determined for book purposes; and (iv) any items in the nature of income or gain that are specially allocated to such Member or Economic Interest Owner pursuant to Sections 5.05 and 5.06.  The Capital Account of each Member or Economic Interest Owner shall be debited with (i) the cash distributed to such Member or Economic Interest Owner; (ii) the Gross Asset Value of property distributed to such Member or Economic Interest Owner (net of liabilities assumed by the Member or Economic Interest Owner or to which the property is subject and/or liabilities the Member or Economic Interest Owner is considered to assume or take subject to under Section 752 of the Code) pursuant to Section 10.03 hereof upon liquidation of the Company; (iii) such Member's or Economic Interest Owner's allocable share of Losses (or items thereof), as properly determined for book purposes; and (iv) any items in the nature of deduction and loss that are specially allocated to such Member or Economic Interest Owner pursuant to Sections 5.05 and 5.06.  The manner in which Capital Accounts are to be maintained pursuant to this Section 4.04 is intended to comply with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder.

(b)     Generally, a transferee of a Membership or Economic Interest will succeed to the Capital Account relating to such interest transferred.

(c)     Except as otherwise provided in this Section 4.04, the recognition and classification of items of Profits, Losses and deduction for purposes of this Section 4.04 shall be the same as their recognition and classification for federal income tax purposes.

(d)     If the adjusted tax basis of the Company property is adjusted under Code Sections 732, 734 or 743, the Capital Accounts of the Members and Economic Interest Owners shall be maintained in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(m), as amended.

(e)     Other adjustments may be made to Capital Accounts to reflect special items or circumstances in accordance with the Treasury Regulations promulgated under Section 704(b) of the Code, and if such Treasury Regulations do not provide guidance as to the appropriate treatment of an item, such item shall be reflected in the Member's or Economic Interest Owner's Capital Account in accordance with the principles of Treasury Regulation Sections 1.704-1(b)(2)(iv)(f) and (g) and 1.704-1(b)(4).

4.05     Restrictions Relating to Capital. Except as otherwise specifically provided to the contrary in this Agreement, no Member or Economic Interest Owner shall (a) have the right to withdraw or reduce any of its Capital Contributions; (b) be entitled to receive interest on its Capital Contributions; (c) have the right to partition Company property or to receive property other than cash, if any, in return for its Capital Contributions; (d) except as set forth in Section 4.06 hereof, be liable to the Company or to any other Person to reimburse any other Member or Economic Interest Owner for any portion of the investment of such other Member or Economic Interest Owner in the Company; or (e) have the right to the return of any of its Capital Contributions prior to dissolution and termination of the Company, and then only to the extent of any cash distributable under Section 10.03 hereof.

4.06     Liability of Members and Economic Interest Owners. Each Member's and Economic Interest Owner's liability shall be limited as set forth in this Agreement, the Act and other applicable law.  A Member or Economic Interest Owner shall not be personally liable for any debts or losses of the Company beyond its Capital Contributions and any obligation of the Member or Economic Interest Owner under Sections 4.01 and 4.03 to make Capital Contributions, except a Member or Economic Interest Owner who receives the return in whole or in part of its Capital Contributions or any other distribution is liable to the Company only to the extent now or hereafter provided by the Act or law.

4.07     Issuance of Membership Interests. Subject to the terms and conditions of Section 4.03 hereof, additional Membership Interests, including, without limitation, Profit Units and Profits Interests, may be issued by the Company from time-to-time as approved by the Managers within its sole and absolute discretion without the consent or approval of any other Member. They may be issued for such consideration as is determined from time-to-time by the Managers within its sole discretion and consisting of any or all of the following: money paid; labor done; services actually rendered to the Company, any of its wholly owned subsidiaries or for any of their benefit; debts or securities canceled; and tangible or intangible or intangible property actually received either by the Company or by a whollyowned subsidiary. If the consideration received by the Company is other than money paid, the valuation of such consideration shall be within the sole and absolution discretion of the Managers (e.g., if a Person makes a Capital Contribution of property to the Company in exchange for the issuance of Membership Interests, the valuation of such property and the amount of Membership Interests in the Company to be issued to the Person shall be within the sole and absolute discretion of the Managers).  The Company may issue one or more classes or series of Membership Interests and/or Economic Interests, with full, limited or no voting rights and with such other rights, preferences, privileges and restrictions as are approved by the Managers within its sole discretion.

4.08     Loan Transactions. Notwithstanding any other provision of this Agreement to the contrary, the Managers may authorize unsecured loans to the Company from the Managers and/or one or more of the Members on such terms that the Managers shall approve.

ARTICLE V
ALLOCATIONS AND DISTRIBUTIONS

5.01     Allocations of Profits and Loss.

(a)      After giving effect to the special allocations set forth in Section 5.04 hereof and subject to the other provisions of this Section, any remaining Profits or Losses for the taxable year (or items of income, gain, loss or deduction) shall be allocated among the Members in such ratio or ratios as may be required to cause the balances of the Managers' and Member's Capital Accounts to be as nearly equal to their respective Target Balances as possible, consistent with compliance with Section 704(b) of the Code.

(b)      The parties hereto intend that the provisions of this Sections 5.01 and 5.05 (the "Allocation Provisions") shall produce final Capital Account balances of the Managers and Members that are identical to the distributions that the Managers and Members receive under the order of priorities set forth in Section 5.02 hereof.  To the extent that the Allocation Provisions would fail to produce such final Capital Account balances as of the close of any taxable year of the Company (based on the assumptions that (i) all assets still owned by the Company at the close of such year are sold at such time for their Gross Asset Values, (ii) the Managers and Members have contributed any amounts needed to satisfy any remaining Company liabilities for which the Managers and Members would be liable, to the extent such obligations would apply after the deemed sale described in preceding clause (i), and (iii) all proceeds were distributed

in liquidation of the Company), Profits and Losses of the Company for the current taxable year and future taxable years (or items of gross income and deduction of the Company for such years) shall be reallocated by the Managers among the Managers and Members as necessary to produce such result (or, to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction (including gross deduction) for the current year, future years and for prior taxable years for which a tax return has not been filed and such filing would be timely) as determined by the Managers in good faith.

(c)      The taxable income or loss of the Company (and items thereof) shall be allocated among the Managers and Members in the same manner as the corresponding items of Profits and Losses and separate items of income, gain, loss and deduction (excluding items for which there are no related tax items) are allocated among the Managers and Members for Capital Account purposes; provided that, in the case of any Company asset whose Gross Asset Value differs from its adjusted tax basis for United States federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Section 704(c) of the Code (in any manner to constitute a "reasonable method" under the Treasury Regulations thereunder) so as to take account of the difference between the Gross Asset Value and the adjusted tax basis of such asset.

(d)      Notwithstanding anything contained in this Section 5.01 to the contrary, in no event shall Losses be allocated to the Managers or a Member to the extent that such allocation of Losses would cause (or increase) a negative Capital Account balance for such Person.

5.02      Distributions of Available Cash. Except as otherwise provided in this Agreement, Available Cash shall be distributed among all of the Members in accordance with their Profits Interests.

5.03      Timing of Distributions of Available Cash. Available Cash of the Company shall be distributed to the Members and Economic Interest Owners at such times as determined by the Managers within their sole discretion.

5.04      Limitations Upon Distributions. No distribution shall be declared and paid if, after giving effect to the distribution, the liabilities of the Company (other than liabilities to Members and Economic Interest Owners on account of their Capital Contributions and Additional Cash and liabilities as to which recourse of creditors is limited to specified property of the Company) exceed the fair market value of the Company's assets, provided that the fair market value of any property that is subject to a liability as to which recourse of creditors is so limited shall be included in the Company assets only to the extent that the fair market value of the property exceeds this liability.

5.05      Special Allocations. The following Sections shall apply notwithstanding Sections 5.01:

(a)      No Impermissible Deficits. Loss allocations to a Member shall be made only to the extent that such Loss allocations will not create an Adjusted Capital Account Deficit balance for that Member. Any Losses not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of Losses under this Section 5.05(a) hereof).

(b)      Company Minimum Gain Chargeback. Notwithstanding any other provision of this Article V, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-(2)(g)(2) of the Regulations. The items to be so allocated shall be determined in accordance with Section 1.704-2(f) of the Regulations. This Section 5.05(b) is intended to comply with the minimum gain chargeback requirement of the Regulations and shall be interpreted consistently therewith.

(c)      Member Minimum Gain Chargeback. Notwithstanding any other provision of this Article V except Section 5.05(b) hereof, if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member with a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in proportion to, and to the extent of , an amount equal to such Member's share of the net decrease in Member

16

Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations. The items to be so allocated shall be determined in accordance with Section 1.704-2(i)(5) of the Regulations. This Section 5.05(c) is intended to comply with the Member minimum gains chargeback requirement of the Regulations and shall be interpreted consistently therewith.

(d)     Qualified Income Offset.  In the event any Member expectedly or unexpectedly receives any adjustments, allocations or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required be the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 5.05(d) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been tentatively made as if this Section 5.05(d) were not in the Agreement.

(e)     Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to Regulations Sections 1.704-2 (g)(1) and 1.704-2 (i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 5.05(e) shall be made only if any to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article V have been made as if Sections 5.05(c) and Section 5.05(d) hereof were not in the Agreement.

(f)     Nonrecourse Deduction.  Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Members and Economic Interest Owners in accordance with the ratio of their respective Profits Interests.

(g)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

5.06     Curative Allocations.  The "Regulatory Allocations" consist of the allocations to a Member (or its predecessor) under Sections 5.05(a), 5.05(b), 5.05(c), 5.05(d), 5.05(e), 5.05(f) and 5.05(g) hereof. Notwithstanding any other provisions of this Article V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.  The Managers shall have reasonable discretion, with respect to each Fiscal Year, to: (i) apply the provisions of this Section 5.06 in whatever order is likely to minimize the economic distortions that might otherwise result from the Regulatory Allocations, and (ii) divide all allocations pursuant to this Section 5.06 among the Members in a manner that is likely to minimize such economic distortions.

5.07     Miscellaneous Tax Provisions.

(a)     Income Characterization.  For purposes of determining the character (as ordinary income or capital gain) of any taxable income of the Company allocated to the Members pursuant to this Article V, such portion of the taxable income of the Company allocated pursuant to this Article V which is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, to be allocated among the Members in the proportion which the amount of depreciation previously allocated to each Member bears to the total of such depreciation allocated to all Members.  This Section 5.06(a) shall only alter the character of income so allocated and not the amount of allocations among the Members pursuant to Article V.

(b)     Change in Profits Interest.  If any Member's Profits Interest changes during a Fiscal Year for any reason, including without limitation, the transfer of any Interest in the Company, such allocations of taxable income or loss shall be adjusted as necessary to reflect the varying interest of the Members during such year.

17

(c)    References to Regulations. Any reference in this Article V to a provision of proposed and/or temporary Regulations shall, in the event such provision is modified or renumbered, be deemed to refer to the successor provision as so modified or renumbered, but only to the extent such successor provision applies to the Company under the effective date rules applicable to such successor provision.

(d)    Intent of Allocations. The parties intend that the foregoing tax allocation provisions of this Article V shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances under Section 10.03 hereof to be made (after unpaid loans and interest thereon, including those owed to Members have been paid) so that each Member receives a substantially identical amount as if such distribution was made pursuant to Section 5.02. To the extent that the tax allocation provisions of this Article V would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Managers if and to the extent necessary to produce such result and (ii) taxable income and taxable loss of the Company for prior open years (or items of gross income and deduction of the Company for such years) shall be reallocated among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years.

(e)    Excess Nonrecourse Liability Safe Harbor. Pursuant to Regulations Section 1.752-3(a)(3), solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the Company (as defined in Regulations Section 1.752-3(a)(3)), the Members' respective interests in Company Profits shall be their respective Profits Interest.

    5.08    Mandatory Allocations - Section 704(c). If Code Section 704(c) or Code Section 704(c) principles applicable under Treasury Regulations Section 1.704-1(b)(2)(iv) require allocations of taxable income or loss of the Company in a manner different than that set forth above, the provisions of Section 704(c) and the regulations thereunder shall control such allocations among the Members. Any item of income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company or pursuant to which has been revalued for Capital Account purposes pursuant to Treasury Regulations Section 1.7041(b)(2)(iv) and which is required or permitted to be allocated to such Member for income tax purposes under Section

704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under Code Section 704(c) as determined by the Managers, including curative allocations.

    5.09    Creditor of the Company. Any Person providing credit to or performing services for the Company in exchange for interest or compensation based on a percentage of the Profits shall be allocated the agreed upon percentage of Company gross income as interest or compensation, as the case may be.

    5.10    Nonrecourse Creditor. A creditor who makes a nonrecourse loan to the Company may not acquire, at any time as a result of making the loan, any direct or indirect interest in the Profits, Losses, distributions, property or other items of the Company other than as a secured creditor.

    5.11    Compensation to Members for Services. If, in accordance with the terms of this Agreement, any fee is paid to a Member or Economic Interest Owner for services performed in a Company capacity and it is measured by Profits, the Company, at its discretion, may treat such fee as a distribution of Profits to the Member or Economic Interest Owner receiving such fee and specially allocate to such Member or Economic Interest Owner an equal amount of the Profits.

ARTICLE VI
TRANSFER OF MEMBERSHIP AND ECONOMIC INTEREST

    6.01    Right of Member and Economic Interest Owner to Transfer.

(a)    Except as otherwise specifically provided in this Article VI and, in the case of the admission or substitution of a Member, in Article VII hereof, neither a Member nor an Economic Interest Owner shall have the right to Dispose of all or any portion of its Membership Interest or Economic Interest or any right or interest therein.

18

(b)      Each Member and Economic Interest Owner hereby acknowledges the reasonableness of the restrictions on a Disposition of Membership Interests and Economic Interests imposed by this Agreement in view of the Company purposes and the relationship of the Members and Economic Interest Owners. Accordingly, the restrictions on Dispositions contained herein shall be specifically enforceable.

6.02      Effective Date of Disposition.

(a)      Subject to Section 6.02(b) hereof, the Disposition of all or any portion of a Membership or Economic Interest, or any right or interest therein, shall not be effective unless and until:

(i)      The Managers approves the Sale or Gift within their sole discretion;

(ii)      A duly executed and acknowledged written instrument of assignment, which is reasonably satisfactory in form and substance to the Managers, is filed with the Company which sets forth a proposed assignment date and the assignor and Transferee execute and acknowledge such other instruments as the Managers may deem reasonably necessary to effectuate such assignment and substitution;

(iii)      The Transferee agrees in writing to be subject to and bound by all the terms, and conditions of this Agreement as it may have been amended;

(iv)      The Transferee makes each of the investment representations to the Company set forth in this Agreement;

(v)      All of the provisions of Section 6.04 of this Agreement are fully complied with and satisfied;

(vi)      If the event is an admission or substitution, the Person to be admitted or substituted agrees in writing to assume the obligations of the assignor under this Agreement as it may have been amended; and

(vii)      The Transferee delivers to the Company such other certificates, representations and documents, and performs such other acts, which the Managers may deem reasonably necessary, to (A) constitute such Person as a Member or Economic Interest Owner, (B) preserve the Company after the completion of such Disposition under the laws of each jurisdiction in which the Company is qualified, organized or does business, (C) maintain the status of the Company as a partnership for federal tax purposes and (D) assure compliance with any applicable state and federal laws including securities laws and regulations.

A Transferee satisfying such requirements shall have the right to receive distributions of cash or other property from the Company, after the effective date of the assignment, to which the assignor would have been entitled.

(b)      Notwithstanding anything contained in this Agreement to the contrary, unless and until all of the applicable provisions of Article VII hereof are satisfied, an admission or substitution of a Member shall not be effective, and the proposed Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member.  Such Transferee shall be merely an Economic Interest Owner.

6.03 Effect of Prohibited Disposition.  Any Disposition in contravention of any of the provisions of Articles VI or VII of this Agreement shall be void and ineffectual and shall not be binding upon or be recognized by the Company.

6.04      Right of First Refusal from the Members and Economic Interest Owners.

(a)      Grant.

(i)      Except for certain Dispositions permitted by Sections 6.04(c) hereof and subject to Section 6.05 hereof, if any Member, Economic Interest Owner or any Transferee of any Membership or Economic Interest desires to consummate or enter into a Contract for any Disposition of (a "Proposed Restricted Disposition") all or any portion of its Membership Interest or Economic Interest, or any right or interest therein, voluntarily, by operation of law, or otherwise (in either case such Member, Economic Interest Owner and Transferee or Transferees are sometimes referred to as the "Disposing

19

Member") to any Person, then the Disposing Member shall obtain from such Person a bona fide written offer to acquire such interest, the Disposing Member shall give written notice (the "Offer Notice") to the Managers, Members, Economic Interest Owners and the Company of its intention and shall comply with the right of first refusal procedures described below.

(ii)     The Offer Notice shall be signed by such Disposing Member and shall (A) identify the Person or Persons to whom such Disposition is proposed to be made (the "Prospective Purchaser"); (B) specify the amount of Membership or Economic Interest proposed to be Disposed of (the "Offered Interests") and the manner of Disposition; (c) state the kind and aggregate amount of consideration proposed to paid or delivered by the Prospective Purchaser for the Offered Interests (the "Offer Consideration") and the amount thereof allocable to each unit of the Offered Interests, and the timing of the payment or other delivery thereof; and (D) describe the other material terms and conditions of the proposed Disposition to the Prospective Purchaser. The Disposing Member shall promptly provide such additional information concerning the Prospective Purchaser and the Proposed Restricted Disposition as the Managers may reasonably request and which the Disposing Member possesses or can obtain without unreasonable effort or expense.

(iii)    At any time, within ten (10) Business Days after receipt of the Offer Notice by the Members, each Member other than the Disposing Member ("Offeree Members") shall have the option, and not the obligation, to purchase an amount of the Offered Interests described therein at the price and on the terms stated in the Offer Notice or as otherwise determined hereunder; provided, however, that the option shall only exist for all, and not less than all, of the Offered Interests.  Each such Offeree Member may exercise its option within such ten (10) Business Day period by delivering to the Disposing Member a written notice of acceptance.  The acceptance notice shall be signed by the Offeree Member and state the amount of the Offered Interests the Offeree Member desires to purchase.  Each Offeree Member shall have the right to purchase an amount of the Offered Interests equal to its Pro Rata Share, but the Offeree Members may agree among themselves to purchase the amount of Offered Interests in different proportions and the Offer Notice may be accepted by any of the Offeree Members jointly or by one of them alone. If all of the Offeree Members do not claim their respective proportions, the unclaimed Offered Interests shall be used to satisfy the claims of Offeree Members for Offered Interests in excess of their proportions and if the claims in excess are more than sufficient to exhaust such unclaimed shares, the unclaimed shares shall be divided among the Offeree Members desiring excess shares in proportion to their Pro Rata Shares, but no Offeree Member shall be bound to take any Offered Interests in excess of the amount which it desires.

(iv)     If the amount of Offered Interests so elected to be purchased by the Offeree Members is still less than the total amount of the Offered Interests, no Offeree Member shall have the right to purchase any of the Offered Interests and the right of all of the Offeree Members shall be deemed to have expired without having been exercised.

(v)      Within five (5) Business Days after the expiration of the ten (10) Business Day option period of the Offeree Members, the Disposing Member shall notify ("Confirmation Notice") all of the electing Offeree Members (the "Electing Members") as to the amount of the Offered Interests as to which its election is effective, and the Disposing Member and each Electing Member shall Dispose of the Offered Interests in the manner and on the terms and conditions specified in the Offer Notice.

(vi)     Notwithstanding any other provision of this Agreement, if the purchase price offered by the proposed Transferee is other than solely in cash, each Electing Member shall pay an amount in cash that such Electing Member and the Disposing Member agree to be equivalent to the Fair Market Value of such offered purchase price. Notwithstanding the preceding sentence, if an Electing Member and the Disposing

Member are unable to so agree within thirty (30) days, then the purchase price shall be determined in the manner specified in Section 6.04(d) hereof.

(b)     Non-Exercise of Right of First Refusal.  The Disposing Member may withdraw the Offer Notice and the offer to Dispose of the Offered Interests at any time prior to the exercise of the options as provided in Section 6.04(a) hereof, and the Offered Interests and the Disposing Member shall thereupon be restored to their status prior to the giving of the Offer Notice.  If the Offer Notice is not so withdrawn and the Offeree Members do not exercise their options hereunder, or are deemed not to have exercised their options hereunder because all of the Offered Interests was not elected to be purchased, all of the Offered Interests may be transferred at any time after thirty (30) days after receipt of the Offer Notice by the Offeree Members but prior to ninety (90) days after such receipt on the terms and conditions specified in the Offer Notice.  Any proposed Disposition (other than to a Permitted Transferee pursuant to Section 6.04(c) hereof) on terms and conditions materially less favorable to the Disposing Member than those described in the Offer Notice, as well as any subsequent proposed Disposition of any Membership Interest or Economic Interest, shall again be subject to the right of first refusal and shall require compliance by the Disposing Member with the procedures described in this Section 6.04.  Any Transferee of the Offered Interests shall hold such Membership and/or Economic Interest subject to all of the terms and conditions of this Agreement.

(c)     Permitted Transfers of Membership and Economic Interests.  Notwithstanding any other provision of this Section 6.04, and without compliance with Section 6.04(a) hereof, any Member or Economic Interest Owner may Dispose of its Membership or Economic Interest to any Permitted Transferee; provided, however, that any Permitted Transferee shall hold the Membership or Economic Interest subject to all of the provisions of this Agreement and shall not Dispose of all or any portion of its Membership or Economic Interest, or any right or interest therein, except in accordance with this Agreement.

(d)     Determination of Purchase Price.

(i)   The price for the Offered Interests purchased pursuant to Section 6.04(a)(vi) hereof shall be determined by an Appraiser selected by the Managers and reasonably acceptable to the Disposing Member and Electing Members.  The parties shall use their best efforts to cause the Appraiser to complete its valuation in writing within sixty (60) days of engagement.

(ii)  The Appraiser shall determine the Fair Market Value of the Offered Interests in accordance with the terms of this Agreement and he shall have no authority to alter or change its terms.  If the Appraiser establishes a range of values for the Offered Interests, the midpoint will be the value of the Offered Interests.  In determining such purchase price, the Appraiser shall consider all opinions and relevant evidence submitted to it by any of the Members and Economic Interest Owners, and shall set forth its determination in writing together with its opinion and the considerations on which such opinion is based, with a signed counterpart to be delivered to each of the Disposing Member and the Electing Members, within sixty (60) days after the Appraiser is notified of and accepts its appointment as such.  Such determination shall be final, binding and conclusive on the parties hereto.

(iii) One-half of the expenses and fees of the Appraiser shall be paid by the Electing Members and one-half by the Disposing Member; provided that each party shall bear the expense of its own appraiser and in presentation of evidence to the Appraiser.

(e) Closing Mechanics.  Any Disposition of an Offered Interest pursuant to Section 6.04 of this Agreement shall be consummated as follows: the Disposing Member shall designate a date (the "Closing Date") for consummation of the transaction, which shall be in accordance with this Section 6.04.  If such date is not a Business Day, the Closing Date shall be the next subsequent Business Day.  On or before the Closing Date, the Electing Members shall deliver to the Disposing Member or his personal or legal representative the purchase price of the Offered Interest to be acquired by them in the form designated in the notice.  At that time, the Disposing Member or his personal or legal representative shall deliver to the purchaser(s) the original certificate or certificates evidencing the Offered Interest to be sold, properly endorsed for transfer, or a properly executed agreement transferring the Offered Interest to the purchaser(s) if the Offered Interest is uncertificated.

6.05     Buy-Out Option Upon the Occurrence of a Buy-Out Event.

(a)      Upon the occurrence of a Buy-Out Event, the Company and the Managers shall have the option (the "Buy-Out Option") to purchase all of the Membership Interest ("Selling Interest") of a Member (the "Selling Member") who is subject to the Buy-Out Event at the Buy-Out Purchase Price and on the Buy-Out Terms. Each Member agrees that if such Member is subject to a Buy-Out Event, such Member will promptly give Notice of a Buy-Out Event to the Managers and the Company.

(b)      Upon and after the occurrence of a Buy-Out Event, the Company and the Managers shall have the Buy-Out Option to elect to purchase all (but not less than all) of the Selling Interest by delivering a written notice (a "Offer Notice") to the Selling Member. The Buy-Out-Option may be exercised, within the discretion of the Managers, by the Managers for itself or on behalf of the Company by written notice to the Selling Member.  Such notice shall state that the Managers or the Company elects to exercise the Buy-Out Option for all of the Selling Interest. Upon exercise of the Buy-Out Option, the Selling Member and the Managers or the Company, as applicable, shall have entered into a binding agreement as described herein for the purchase and sale of the Selling Interest for the BuyOut Purchase Price and the Buy-Out Terms, which shall be consummated in accordance with the terms described herein.

(c)      The purchase and sale of the Selling Interest shall close (the "Buy-Out Closing") within thirty (30) days after determination of the Buy-Out Purchase Price; provided, however, that the Managers may withdraw its exercise of its Buy-Out Option at any time prior to the Buy-Out Closing by written notice to the Selling Member.  The Buy-Out Closing will occur at such time and place as designated by the Managers. At the Buy-Out Closing, the Selling Member shall deliver to the Managers the original certificate or certificates evidencing the Selling Interest properly endorsed for transfer, or a properly executed agreement transferring the Selling Interest to the Managers or the Company as applicable if the Selling Interest is uncertificated, and the Managers shall pay to the Selling Member the Buy-Out Purchase Price on the Buy-Out Terms.

6.06     Option to Purchase Membership Interests

(a)      Grant of the Purchase Option.  Each Member and Economic Interest Owner ("Subject Member") hereby grants the Managers an option (the "Purchase Option") to purchase, or to cause the Company to purchase, all, and not less than all, of its Membership and Economic Interests ("Subject Interest") on the terms and conditions hereinafter set forth.

(b)      Duration of the Purchase Option.  The Purchase Option shall become effective with respect to any Subject Member on date that the Subject Member engages in any Competitive Business anywhere in the Geographic Area and shall continue in effect thereafter until exercised the Managers.

(c)      Manner of Exercise.  The Purchase Option may be exercised, within the discretion of the Managers, by the Managers for itself or on behalf of the Company by written notice to the Subject Member. Such notice shall state that the Managers or the Company elects to exercise the Purchase Option for all of the Subject Interest. Upon exercise of the Purchase Option by the Managers, the Subject Member and the Managers or the Company, as applicable, shall have entered into a binding agreement for the purchase and sale of the Subject Interest for the Purchase Price, which shall be consummated in accordance with the terms described herein.

(d)      Purchase Price.

(i)   The purchase price for the Subject Interest ("Purchase Price") shall be twenty-five percent (25%) of the Fair Market Value of the Subject Interest.  The Purchase Price shall be determined by an Appraiser selected by the Managers.  The parties shall use their best efforts to cause the Appraiser to complete its valuation in writing within sixty (60) days of engagement.

(ii)  The Appraiser shall determine the Fair Market Value of the Offered Interests in accordance with the terms of this Agreement and he shall have no authority to alter or change its terms. Promptly after the selection of the Appraiser, the Managers and the Subject Member may each submit to the Appraiser (and to each other) a written statement of their position regarding the

Fair Market Value of the Subject Interests and supporting arguments, and each shall be given a period of five (5) Business Days thereafter to submit to the other and to the Appraiser a written response to such written statement of the other. The Appraiser shall, within forty-five (45) days of the date of its selection, determine the Fair Market Value of the Subject Interest by choosing either the Fair Market Value of the Managers set forth in its statement or the Fair Market Value of the Subject Member set forth in its statement, whichever in the opinion of such Appraiser is more consistent with the purposes and intent of this Agreement. The Appraiser shall have no authority to make any change, amendment or revision in any party's position or to change or alter any of the provisions of this Agreement. The Appraiser shall promptly deliver a written decision with respect to the determination to each of the parties, who shall promptly act in accordance therewith. Each party agrees that any decision of the Appraiser shall be final, conclusive and binding and that they will not contest any action by any other party thereto in accordance with a decision of the Appraiser. It is specifically understood and agreed that any party may enforce any decision of the Appraiser pursuant to this this Section by bringing suit in any court of competent jurisdiction.

(iii) One-half of the expenses and fees of the Appraiser shall be paid by the Managers (or Company) and one-half by the Subject Member; provided that each party shall bear the expense of its own appraiser and in presentation of evidence to the Appraiser.

(e) <u>Closing</u>. The purchase and sale of the Subject Interest shall close (the "Closing") within thirty (30) days after determination of the Purchase Price; provided, however, that the Managers may withdraw its exercise of the Purchase Option at any time prior to the Closing by written notice to the Subject Member. The Closing will occur at such time and place as designated by the Managers. At the Closing, the Subject Member shall deliver to the Managers the original certificate or certificates evidencing the Subject Interest properly endorsed for transfer, or a properly executed agreement transferring the Subject Interest to the Managers or the Company as applicable if the Purchased Interest in uncertificated, and the Managers shall pay to the Subject Member the Purchase Price (25% of the Fair Market Value of the Subject Interest) as provided in this Agreement. One third (1/3) of the Purchase Price shall be due any payable to the Subject Member upon the Closing, one-third (1/3) shall be due and payable on the date twelve (12) months from the Closing and the final one-third (1/3) shall be due and payable on the date twenty-four (24) months after the Closing.

ARTICLE VII
ADMISSION, SUBSTITUTION AND WITHDRAWAL OF MEMBERS

7.01 <u>Limitation on Admission or Substitution</u>. No Person shall be admitted as a Member of the Company, no Member shall have the right to substitute an assignee as a Member in its place, and no Transferee (except as set forth in the proviso of this Section 7.01) of the whole or any portion of a Membership Interest shall become a substituted Member in place of its assignor, unless the Managers, within its sole and absolute discretion, consent to such admission or substitution; provided, however, that any Permitted Transferee of the whole or any portion of a Membership Interest shall become a substituted Member in place of its assignor upon satisfaction of the conditions set forth in Section 7.02 without the consent of the Managers.

7.02 <u>Requirements for Admission or Substitution</u>. The admission of a Person as a Member and the substitution of a Member shall not be effective unless and until all of the following provisions are fully complied with and satisfied:

(a) The Managers approves by written consent the admission or substitution; provided, however that if the transferee is a Permitted Transferee, the consent of the Managers shall be limited to a reasonable confirmation that the Person to be admitted or substituted is a Permitted Transferee;

(b) If the admission involves the transfer of a Membership Interest, all of the provisions of Sections 6.04 and 6.06 of this Agreement (to the extent applicable) are fully complied with and satisfied; and

(c) The Person to be admitted or substituted pays to the Company a transfer fee in an amount equal to the reasonable expenses incurred by the Company in connection with such assignment and substitution, as determined in good faith by the Managers.

23

7.03 <u>Discretionary Substitution by the Managers</u>.  The Managers may elect to treat a Transferee who has not become a substituted Member pursuant to this Article VII as a substituted Member in the place of his assignor, to the extent of the Membership Interest assigned, should it deem in its sole discretion that such treatment is in the best interests of the Company, and that substitution is not prohibited by the Act.

7.04 <u>Assignments Subject to Article VI</u>.  All references to the transfer of a Member's interest in this Article VII shall at all times also be subject to the provisions of Article VI hereof.

7.05 <u>Withdrawal of Members</u>.  Unless otherwise approved by the Managers within its discretion, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Withdrawal Event, regardless of whether such Withdrawal Event was the result of a voluntary act by such Resigning Member, shall be entitled to receive only those distributions to which such Resigning Member would have been entitled had such Resigning Member remained a Member (and only at such times as such distribution would have been made had such Resigning Member remained a Member).  Except as otherwise expressly provided herein, a Resigning Member shall become an Economic Interest Owner.

7.06 <u>Legal Representative of Member and Economic Interest Owner</u>.  If a Member or Economic Interest Owner who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's or Economic Interest Owner's executor, administrator, guardian, conservator or other legal representative ("Successor") may exercise all of the Member's or Economic Interest Owner's rights for the purpose of settling his estate or administering his property, provided, however, that for all purposes of this Agreement, unless and until Articles VI and VII have been fully complied with and satisfied, the Successor shall not be considered a Member and shall have no right to vote, approve or consent to any matter pursuant to this Agreement.

ARTICLE VIII
BOOKS, RECORDS, REPORTS, ACCOUNTING AND CERTIFICATES

8.01  <u>Books and Records</u>.  Proper and complete books of account of the Company, copies of the Company's federal, state and local tax returns for each Fiscal Year, this Agreement and the Articles of Organization shall be kept under the supervision of the Managers at the Company's principal office. The Company's books and records may be inspected by the Members as provided in the Act.

8.02  <u>Tax Matters</u>.

(a)  <u>Taxation as a Partnership</u>.  It is the intent of the Managers and Members that the Company shall be, to the extent permissible by applicable Law, treated as a partnership for federal and applicable state and local tax purposes and, accordingly, (i) no Member shall file any election with any taxing authority to have the Company treated otherwise, and (ii) each Member hereby represents, covenants, and warrants that it shall not maintain a position inconsistent with such treatment. The Managers hereby agrees that, except as otherwise required by applicable Law or approved by all of the Members, they (A) will not cause or permit the Company to elect (1) to be excluded from the provisions of Subchapter K of the Code, or (2) to be treated as a corporation (or association treated as a corporation) for any federal, state, or local income tax purposes; (B) will cause the Company to make any election reasonably determined to be necessary or appropriate in order to ensure the treatment of the Company as a partnership for all income tax purposes; (C) will cause the Company to file any required tax returns in a manner consistent with its treatment as a partnership for income tax purposes; and (D) has not taken, and will not take, any action that would be inconsistent with the treatment of the Company as a partnership for such purposes.

(b)  <u>Tax Returns</u>.  The Managers shall use its reasonable commercial efforts to prepare and furnish to the Members, within ninety (90) days after the close of the taxable year of the Company, the income tax returns for the Company and information with respect to the Company necessary for the Members to prepare their federal and state income tax returns.

(c)  <u>Tax Withholding</u>.



24

(i)   The Managers is authorized and directed to cause the Company to withhold from or pay on behalf of any Member the amount of federal, state, local or foreign taxes that the Managers, after consultation with such Member, determines the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement, including, without limitation, any taxes required to be paid by the Company pursuant to Code Sections 1441, 1442, 1445 or 1446 and any taxes imposed by any state or other taxing jurisdiction on the Company as an entity. Without limiting the foregoing, the Managers shall cause the Company to withhold (and remit to the appropriate governmental authority), from amounts otherwise distributable to a Member, any taxes that such Member notifies the Managers in writing should be withheld, which notice shall be given by any Member who becomes aware of any withholding obligation to which it is subject and shall specifically set forth, inter alia, the rate at which tax should be withheld and the name and address to which any amounts withheld should be remitted.

(ii)   If the Company is required to withhold and pay over to taxing authorities amounts on behalf of a Member exceeding available amounts then remaining to be distributed to such Member, such payment by the Company shall constitute a loan to such Member that is repayable by the Member on demand, together with interest at the applicable federal rate determined from time to time under Code Section 7872(f)(2) or the maximum rate permitted under applicable law, whichever is less, calculated upon the outstanding principal balance of such loan as of the first day of each month. Any such loan shall be repaid to the Company, in whole or in part, as determined by the Managers in its sole discretion, either (A) out of any distributions from the Company which the Member is (or becomes) entitled to receive, or (B) by the Member in cash upon demand by the Managers (said Member bearing all of the Company's costs of collection, including reasonable attorneys' fees, if payment is not remitted promptly by the Member after such a demand for payment).

(iii) Each Member agrees to cooperate fully with all efforts of the Company to comply with its tax withholding and information reporting obligations and agrees to provide the Company with such information as the Managers may reasonably request from time to time in connection with such obligations.

 (d) <u>Tax Matters Partner</u>.  The Managers shall perform the duties imposed on a "tax matters partner" in accordance with Section 6231(a)(7) of the Code; provided, however, the Managers shall give notice of all tax audits or other administrative proceedings to the Members.

 8.03 <u>Accounting Method</u>.  The Company shall utilize such method of accounting in keeping its books for both financial accounting and tax purposes as determined by the Managers.

 8.04 <u>Bank Accounts</u>.  The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.  Without limiting the foregoing, the Managers is authorized to endorse checks, drafts and other evidence of indebtedness made payable to the order of the Company, but only for the purpose of depositing the same into the Company's bank accounts. All checks, drafts and other instruments obligating the Company to pay money must be signed in accordance with resolutions mutually acceptable to the Company and the financial institution(s) upon which such instruments are drawn.

8.05     <u>Fiscal Year</u>.  The fiscal year of the Company shall be selected by the Managers.

8.06     <u>Certificate for Membership Interest</u>.

(a)     At the discretion of the Managers, every Member and Economic Interest Owner shall be entitled to have a certificate or certificates signed in the name of the Company by a Person selected and authorized by the Managers certifying the Profit Units and Voting Percentage owned by the Member or Economic Interest Owner.  Any or all of the signatures on the certificate may be facsimile.  In case the Chairman, Managers or Person who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such member, officer, transfer agent or registrar before such certificate is issued, it may be issued by the

Company with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

(b)      Any such certificate shall also contain such legend, or other statement as may be required by the Securities Act and Blue Sky Law, any other applicable law or regulation or this Agreement.

(c)      Certificates for Membership Interests may be issued prior to full payment therefor under such restrictions and for such purposes as the Managers may provide; provided, however, that any such certificates so issued prior to full payment shall state the total amount of the consideration to be paid therefor and the amount paid thereon.

(d)      No new certificates for Membership Interests shall be issued in place of any certificates theretofore issued unless the latter are surrendered and canceled at the same time; provided, however, that a new certificate may be issued without the surrender and cancellation of the old certificate if the certificate theretofore issued is alleged to have been lost, stolen or destroyed. In case of any allegedly lost, stolen or destroyed certificate, the Company may require the owner thereof or the legal representative of such owner to give the Company a bond (or other adequate security) sufficient to indemnify it against any claim that may be made against it (including any expense or liability) on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

ARTICLE IX
CONSENTS AND MEETINGS OF MEMBERS

9.01 <u>Place of Meetings</u>.  All meetings of Members shall be held at the principal executive office of the Company or at any other place, which may be designated by the Managers and stated in the notice of the meeting.

9.02 <u>Meetings</u>.  Meetings of the Members, for the purpose of taking any action which is within the power of the Members, may be called at any time by the Managers.

9.03 <u>Action Without a Meeting</u>.  Any action which under any provision of the Act may be taken at any meeting of the Members may be taken without a meeting, and without notice except as hereinafter set forth, if a consent in writing setting forth the action so taken is signed by the Members having not less than the minimum Voting Percentage that would be necessary to authorize or take such action at a meeting at which all of the Voting Percentage entitled to vote thereon were present and voted and delivered to the Company within sixty (60) days of the record date for that action.

ARTICLE X
DISSOLUTION AND TERMINATION

10.01    <u>Events of Dissolution</u>.  The Company shall be dissolved upon the first to occur of the following events:

(a)      The written consent of the Managers and a Majority-in-Interest of the Members;

(b)      The entry of a decree of judicial dissolution pursuant to the Act; or

(c)      When (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, have been distributed to the Members and Economic Interest Owners in the manner provided for in this Agreement and (ii) the Articles of Organization has been canceled in the manner required by the Act.

10.02    <u>Dissolution and Liquidation of the Company</u>.

(a)      As soon as reasonably possible following the occurrence of any of the events specified in Section 10.01 of this Agreement which effects the dissolution of the Company, the Managers shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear

26



on the records of the Company and file a Certificate of Dissolution with, and on the form prescribed by, the Secretary of State.

(b)       Upon the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until a Certificate of Cancellation, on the form prescribed by the Secretary of State, has been filed with and accepted by the Secretary of State.

(c)       Upon dissolution of the Company pursuant to Section 10.01 of this Agreement or by operation of law, (i) the Managers shall take full account of the Company assets and liabilities; (ii) the receivables of the Company shall be collected; (iii) all of the Company's assets shall be liquidated as promptly as is consistent with obtaining the fair value thereof, except that the Managers may, with the vote or consent of the Managers, distribute all or any portion of the assets of the Company in kind; (iv) allocate any Profits or Losses resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with this Agreement; (v) discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are also creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions and the return of capital; and (vi) establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members and Economic interest Owners, the amounts of such reserves shall be deemed to be an expense of the Company). Upon liquidation and winding up of the Company, any unsold property shall be treated as if sold for its then current value and as if the proceeds from such sale are distributable in accordance with this Agreement, and the gain or loss which would have resulted from such sale shall be allocated pursuant to this Agreement to adjust the Capital Account balances of the Members and Economic Interest Owners prior to the distribution of such unsold property to the Members and Economic Interest Owners.

10.03  Distributions Upon Liquidation. The proceeds from the liquidation of the Company assets and collection of the Company receivables together with assets distributed in kind, to the extent sufficient therefor, after appropriate adjustment to Capital Accounts with respect to Company transactions and operations, shall be applied and distributed in the following order:

(a)       To the expenses of liquidation and the debts of the Company, in the order of priority as provided by law, and the claims of secured creditors whose obligations will be assumed or otherwise transferred on the liquidation of Company assets; and then,

(b)       To the Members and Economic Interest Owners in accordance with Section 5.02 hereof.

10.04  Certificate of Cancellation. When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members and Economic Interest Owners, a Certificate of Cancellation, on the form prescribed by the Secretary of State, shall be filed with the Secretary of State.

10.05  Return of Contribution Nonrecourse to Members. Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member and Economic Interest Owner shall look solely to the assets of the Company for the return of its Capital Contributions. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contribution of one or more Members or Economic Interest Owner, no Member or Economic Interest Owner shall have recourse against any other Member or Economic Interest Owner.

10.06  Deficit Capital Account. Notwithstanding anything to the contrary in this Agreement, other than the provisions of Section 4.03 of this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member or Economic Interest Owner has a deficit balance in its Capital Account (after giving effect to all Capital Contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member or Economic Interest Owner shall have no obligation to make any Capital Contribution, and the negative balance of such Member's or Economic Interest Owner's Capital Account shall not be considered a debt owed by such Member or Economic Interest Owner to the Company or to any other person for any purpose whatsoever.

10.07 <u>Waiver of Partition</u>. The Members and Economic Interest Owners agree that because of the special, unique and extraordinary purposes of the Company and the complexity of the tasks to be performed and the obligations to be assumed and undertaken by the Company, it is necessary that the Company continue in existence. Each Member and Economic Interest Owner further agrees that any remedy in the nature of monetary damages for any dissolution of the Company at a time earlier than is provided herein would be inadequate and speculative and, therefore, each Member and Economic Interest Owner expressly waives and relinquishes its right to voluntarily dissolve the Company without the consent of the other Members, it being agreed that termination and dissolution of the Company shall occur only upon the occurrence of one of the events described in Section 10.01 hereof. Each Member and Economic Interest Owner expressly agrees that the provisions of this Section 10.08 may be specifically enforced by any court of competent jurisdiction upon proper application of any Member or Economic Interest Owner.

ARTICLE XI
INTELLECTUAL PROPERTY

11.01.   <u>Intellectual Property</u>. Each Member, plus Alexander Huwe, Reimund Dann, and each Officer, with respect to himself or itself, its Affiliates, and its and their respective members, managers, officers, directors, employees, vendors, and subcontractors (collectively, "Restricted Persons"), represents, warrants, and agrees as follows:

(a)      The performance of any work by any Restricted Person for Company, or for a Member in its capacity as such, has not breached and will not breach any employment agreement, confidentiality agreement, noncompetition agreement, non-solicitation agreement, intellectual property assignment or license, proprietary information or agreement with, or fiduciary duty to, any current or former employer or other third party. These fiduciary duties include (i) not competing with an employer, not soliciting an employer's customers, not using work time to further any interest other than the employer's, and not using or disclosing confidential information, proprietary information, or trade secrets, except for the employer's benefit and (ii) disclosing to the employer any conflict of interest. Such Member and each Restricted Person of such Member has not brought and will not bring to Company or use in the performance of work for Company or for a Member in its capacity as such, any document or material of a former employer that is not generally available to the public. Each Member and each of its Restricted Persons may lawfully do so.

(b)      Each Member shall and shall cause its Restricted Persons to hold all Company trade secrets and confidential information in confidence and not directly or indirectly disclose any Company trade secret or confidential information to anyone, other than as required in performance of work to be done or duties to be performed for Company by such Member or its Restricted Persons. For purposes hereof, "**Trade Secrets**" includes any and all information pertaining to the Company and any technology, processes, software, source code, design, procedure, formula, method, or any other information that is valuable and not generally known, whether embodied in memoranda, manuals, letters, or other documents, computer disks, tapes or other information storage devices, hardware, or other media or vehicles.

(c)      Each Member shall and shall cause each of its Restricted Persons to, promptly disclose and assign to Company any invention, improvement, technical information, trade secret, know-how, method or suggestion relating to the Business or Company's products, research, or development ("**Inventions**") that such Member or any of its Restricted Persons develops or acquires while working for Company, regardless whether during working hours, together with any patent application, patent, copyright, or reissue thereof that may be granted with respect to any such invention. In connection therewith, each Member shall and shall cause its Restricted Persons, at Company's request and expense, to promptly execute and deliver any application, assignment, description, or other document or instrument as Company deems reasonably necessary to any assign such invention, patent application, patent, copyright, or any reissue thereof to Company and to enable Company to obtain and maintain all rights thereto throughout the world, except all European Union countries.

(d)      Each Member agrees and shall cause each of its Restricted Persons to agree that any original work of authorship, including any document, drawing, mask work or computer program (including all software, firmware, object code, source code, documentation, specifications, revisions, supplements, modules and upgrades), conceived, created, performed, or produced while working for Company, and all foreign and domestic,

28



registered and unregistered, copyrights and mask work rights and applications for registrations therefor related to any such work of authorship, in each case, regardless whether made during regular working hours, relating to Company's business, products, research, or development (collectively, "**Works of Authorship**") shall be the exclusive property of Company and will assign and cause its Restricted Persons to assign any such Work of Authorship to Company and to waive all moral rights with regard thereto.

11.02   Territory. The provisions of this Article shall be the Geographic Area.

11.03 Enforcement. The provisions of this Article are an essential element in the ownership of a Membership Interest (or part thereof). Company or any Member shall be entitled to require specific performance of any such provision, including those requiring or prohibiting a Transfer of all or any part of a Membership Interest.

ARTICLE XII
MISCELLANEOUS

12.01 Amendment. Except where a higher percentage is specifically provided in this Agreement or by the Act, any provision of this Agreement may be amended by the vote at a meeting, or the written consent, of the Managers and a Majority-in-Interest of the Members; provided, however, that (i) any amendment increasing the liability of any Member to the Company or its Members, or adversely affecting the limitation of the liability of a Member with respect to the Company, shall not be effective with respect to such Member until it approves such amendment in writing; and (ii) any amendment changing the allocations of Profits, Losses or distributions pursuant to Article V of this Agreement shall require the unanimous written consent of all of the Members (provided, however, that the issuance of new Membership or Economic Interests, including, without limitation, additional Profit Units and/or Profits Interest and/or any Membership Interests with a preferred interest rate, preference in distributions of Available Cash, preference in the return Capital Contributions and/or any other special rights, preferences and/or privileges, in accordance with Section 4.07 hereof shall not so change the allocations of Profits, Losses or distributions). Subject to the foregoing, this Agreement shall be amended whenever required by the Act, or otherwise by law.

12.02   Power of Attorney.

(a)   Grant of Power of Attorney. By the execution of this Agreement, each Member and Economic Interest Owner hereby appoints and irrevocably constitutes each Managers as its true and lawful attorney-in-fact, with full power and authority to act in its name and on its behalf (except as otherwise provided by law) and in its name to make, execute, acknowledge, publish, file and swear to in the execution, acknowledgment, verification, filing and recording of the following documents: (i) any documents which may be required to effect the continuation of the Company, admission of additional or substituted Members or the dissolution and termination of the Company; provided, however, that such continuation, admission or dissolution and termination is in accordance with the terms of this Agreement; (ii) any amendment to this Agreement which the Managers is authorized to make pursuant to Section 12.01(b) hereof; or (iii) any amendment to this Agreement with the consent or approval of the Members as provided in this Agreement.

(b)   Incidents of Power of Attorney. The power of attorney hereby granted in Section 12.02(a) above: (i) is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death or dissolution of a Member; (ii) may be exercised by executing an instrument as an attorney-in-fact for the Members whose names shall be listed in the instrument as members; and (iii) shall survive the delivery of an assignment by a Member of a Membership or Economic Interest, except that where the assignee thereof has been approved for admission or substitution to the Company in accordance with Article VII hereof, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Managers to execute, acknowledge, and file any instrument necessary to effect such substitution.

12.03 Other Acts. Each party to this Agreement covenants on behalf of itself and its successors, heirs and assigns to execute, with acknowledgment, verification or affidavit if required, any and all documents and writings, and to perform

any and all other acts, that may be necessary or expedient in connection with the creation of this Company, the achievement of its purposes, or the consummation of any matter covered by this Agreement.

12.04 <u>Notices</u>.  All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Schedule "A" attached hereto.  Any such notices shall, unless otherwise provided herein, be given or served (a) by depositing the same in the United States mail, postage paid, and addressed to the party to be notified, (b) by overnight delivery using a nationally recognized overnight courier, (c) by personal delivery, or (d) by electronic communication, including facsimile or e-mail transmission. Notice deposited in the mail in the manner herein above described shall be effective on the third (3rd) Business Day after such deposit.  Notice given in any other manner shall be effective only if and when received by the party to be notified between the hours of 8:00 a.m. and 5:00 p.m. California Time of any Business Day with delivery made after such hours to be deemed received the following business day.  Refusal to accept delivery of any notice, request or demand shall be deemed to be delivery thereof.  A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.  If any party hereto is not an individual, notice may be made on any officer, general partner, Managers or principal thereof.

12.05 <u>Captions</u>.  Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

12.06 <u>Counterparts</u>.  This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement which shall be binding on all the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.  Further, executed copies of this Agreement delivered by facsimile, portable document format (pdf) or other digital transmission shall be deemed an original signed copy of this Agreement. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

12.07 <u>Successors and Assigns</u>.  The terms and conditions of this Agreement shall be binding upon and inure to the benefit of the successors, heirs, executors, administrators and assigns of each of the Members and Economic Interest Owners.

12.08 <u>Governing Law</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of Organization applicable to agreements made and to be performed entirely within such State.

12.09 <u>Entire Agreement</u>.  This Agreement, together with the documents and exhibits referred to herein, embodies the entire understanding among the parties with respect to the subject matter hereof, and merges all prior discussions or communications among them, and no party shall be bound by any definitions, conditions, warranties or representations other than as expressly stated in this Agreement or as subsequently set forth in writing signed by the duly authorized representatives of all of the parties hereto.

12.10 <u>Attorneys' Fees</u>.  In the event any party hereto brings any legal action, suit, counterclaim, appeal, arbitration, mediation or other proceeding ("Party Action") against any other party hereto, declaratory or otherwise, in connection with this Agreement, in addition to any damages, costs or other relief which the prevailing party otherwise would be entitled, the prevailing party shall be entitled to reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in such Party Action and/or enforcing any judgment, order, ruling or award ("Decision") granted therein, all of which must be paid whether or not such Party Action is prosecuted to a Decision. Any Decision entered in such Party Action must contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such Decision. The court or arbitrator may fix the amount of reasonable attorneys' fees and costs on the request of either party.  For purposes hereof, the attorney's fees award shall not be computed in accordance with any court fee schedule but shall be such as to fully reimburse all attorneys' fees reasonably incurred and shall include, without limitation, fees incurred in connection with the following: (a) postjudgment motions and collection actions; (b) contempt proceedings; (c) garnishment, levy and debtor and third party examinations; (d) discovery; and (e) bankruptcy.  As used in this Section, "prevailing party" includes, without limitation, a party who agrees to dismiss a Party Action on the other party's payment of the sum allegedly due, or performance of the covenants allegedly breached, or who obtains substantially the relief sought by it. If there are multiple claims, a prevailing party shall be established for each claim separately by determining which party obtained the greater relief

in connection with such claim; provided, however, that the court or arbitrator may determine that there is no prevailing party with respect to any particular claim.

    12.11   <u>Counsel to the Company</u>.

    (a)    Counsel to the Company may also be counsel to the Managers or any Affiliate of the Managers. The Managers may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel ("Company Counsel") may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules"). Each Member acknowledges that Company Counsel does not represent any Member or other Person (other than the Managers) in the absence of a clear and explicit agreement to such effect between such Person and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to such Person. In the event any dispute or controversy arises between any Member and the Company, or between any Members or the Company, on the one hand, and the Managers (or Affiliate of the Managers) that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may choose to continue to represent the Company or the Managers (or its Affiliate), or each of them, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation. Each Member further acknowledges that Company Counsel has not represented the interests of any Member in the preparation and negotiation of this Agreement.

    (b)    Since this Agreement sets forth the rights and obligations of the Members with respect to each other, the Members acknowledge their understanding that there are inherent potential conflicts among them, or between the Company and them. In addition, due to its multiple representations, Company counsel may also be placed in a position of potential or actual conflict of interest. Every Person who becomes a party to this Agreement, therefore, represents, warrants, acknowledges and agrees that (i) such Person understands that a conflict may exist between such Person's interest in the Company and the interests of the Company and the Members; (ii) such Person understands the reasons why such a conflict may exist; (iii) such Person understands that this Agreement may have tax consequences to such Person; (iv) such Person acknowledges that it has been advised to seek advice of independent counsel before executing this Agreement and such Person has had the opportunity to seek such advice before executing this Agreement; and (v) such Person hereby consents to and authorizes Company Counsel to represent the Company and/or the Managers if a conflict arises in the future among the Members, the Company and/or the Managers concerning this Agreement and each such Person hereby waives any conflict of interest of Company Counsel in connection therewith.

  12.12  <u>Severability</u>.  If any provision of this Agreement shall be held or deemed to be or shall, in fact, be inoperative or unenforceable as applied in any particular case because it conflicts with any other provision or provisions hereof or any constitution or statute or rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstances, or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatsoever. The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement shall not affect the remaining portions of this Agreement.

  12.13  <u>Arbitration</u>.  Any disputes or differences between the parties arising out of this Agreement which the parties are unable to resolve themselves shall be submitted to and resolved by arbitration as herein provided.  Within ten (10) Business Days after commencement of arbitration in accordance with the rules of Judicial Arbitration & Mediation Services, Inc. ("JAMS") then in effect, any of the parties hereto in dispute may request JAMS to designate one arbitrator, who shall be a retired or former judge, is not affiliated with any party in interest to such arbitration and who has substantial professional experience with regard to limited liability company and/or business legal matters.  The arbitrator shall consider the dispute at issue at a mutually agreed upon place and time within thirty (30) days (or such longer period as may be acceptable to the parties hereto in dispute) of the designation of the arbitrator.  The arbitration proceeding shall be held in accordance with the rules for commercial arbitration of JAMS in effect on the date of commencement of such arbitration and shall include an opportunity for the parties to conduct discovery in advance of the proceeding. Notwithstanding the foregoing, the parties hereto agree that they will attempt, and they intend that they and the arbitrator should use their best efforts in that attempt, to conclude the arbitration proceeding and have a final decision from the arbitrator within ninety (90) days from the date of selection of the arbitrator; provided, however, that the arbitrator shall be entitled to extend such 90-day period one or more times to the extent necessary for such arbitrator to place a dollar value on any claim that may be unliquidated.  The arbitrator shall promptly deliver to each

31



of the parties a written decision with respect to the dispute that reveals the essential findings and conclusions upon which the decision is based, and each party shall promptly act in accordance therewith. Each party to such arbitration agrees that any decision of the arbitrator shall be final, conclusive and binding. The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, attorneys' fees and costs), shall be borne by the unsuccessful party and shall be awarded as part of the arbitrator's award. It is specifically understood and agreed that any party may enforce any award rendered pursuant to the arbitration provisions of this Section by bringing suit in any court of competent jurisdiction. The parties hereto agree that the arbitrator shall have authority to grant injunctive or other forms of equitable relief to any party that prevails in any such arbitration. This Section shall survive the termination or cancellation of this Agreement.

12.14   Confidentiality.

(a)     Each Member acknowledges that during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "Confidential Information"). In addition, each Member acknowledges that (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information, (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace, and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)     Nothing contained in Section 12.14 shall prevent any Member from disclosing Confidential Information (i) on the order of any court or administrative agency, (ii) on the request or demand of any regulatory agency or authority having jurisdiction over such Member, (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests, (iv) to the extent necessary in connection with the exercise of any remedy hereunder, (v) to any other Member, the Managers or the Company, (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree in writing to be bound by the provisions of this Section 12.14 as if a Member, or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Membership Interests from such Member, if such potential Permitted Transferee agrees in writing to be bound by the provisions of this Section 12.14 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and Managers of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and Managers) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.14 shall not apply to Confidential Information that (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement, (ii) is or has been independently developed or conceived by such Member without use of Confidential Information, or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives; provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.14 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

12.15 <u>Specific Performance</u>. The Members agree that irreparable damage will result if this Agreement is not performed in accordance with its terms, and the Members agree that damages that may be available at law for a breach of this Agreement would not be an adequate remedy. Therefore, the provisions hereof and the obligations of the Members hereunder shall be enforceable in a court of equity, or other tribunal with jurisdiction, by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies and all other remedies provided for in this Agreement shall however, be cumulative and not exclusive and shall be in addition to all other remedies that a Member may have under this Agreement, at law or in equity.

12.16 <u>Reliance on Authority of Person Signing Agreement</u>. If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

12.17 <u>Estoppel Certificate</u>. Each Member shall, within ten (10) days after written request by any Managers, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by such Member, or if there is a default, the nature or extent thereof.

12.18 <u>No Rights of Third Parties</u>. Except as expressly provided in this Agreement, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon or give any Person (including creditors, equity holders and Affiliates of any party hereto) other than the parties hereto any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, all of which shall be for the sole and exclusive benefit of the parties.

[Signature Page Follows]



IN WITNESS WHEREOF, this Agreement has been executed as of the date first herein above written.

**MEMBER:**
David Cohen

_David Cohen_

**MEMBER:**
Jason Bokor

_Jason Bokor_

**MEMBER:**
Pioonier International

Name.  Reimund Dann       **Alex Huwe**

Title.  General Manager      **General Manager**

Members – Signature Page

**MANAGER:**
David Cohen

*David Cohen*
_____

**MANAGER:**
Jason Bokor

*Jason Bokor*
_____



Managers – Signature Page
**SCHEDULE "A"**
**MEMBERSHIP INTEREST OF THE MEMBERS**

| Name | Address | Capital Contribution | Capital Account | Units | Percentage Interest |
|------|---------|----------------------|-----------------|-------|---------------------|
| | | | | | |
| David Cohen | 400 Costa Del Sol Way Malibu, CA 902652 | $50,000.00 | $0.00 | 450 | 45% |
| Jason Bokor | 242 Young Street, Unit 803 Montreal Quebec Canada H3C0R7 | $50,000.00 | $0.00 | 450 | 45% |
| Pioonier International | Brezovska Street 36 Plovdiv 4000 Bulgaria | The assets as set forth on Schedule "B", attached hereto | $0.00 | 100 | 10% |
| **Total** | | **$100,000.00** | $0.00 | **1,000** | **100%** |

Schedule "A"



**SCHEDULE "B"**

## IP ASSIGNMENT

This IP Assignment (the "Patent Assignment") is effective as of October 1, 2022 (the "Effective Date") by and between Alex Huwe and Reimund Dann (the "Assignors"), and Pioonier Group, LLC, a Delaware limited liability company with a place of business at 400 Costa Del Sol Way, Malibu, California 90265 ("Assignee") and concerns the national patent applications or patents of the international patent application no. PCT/DE2020/100970 "*Thermokinetic Mixer for Melt-Mixing Waste Plastic Products*" in USA, Canada, India and Korea, the future national patent applications or patents of the international patent application PCT/EP2022/056748 "*Method for Producing a Shaped Body from Plastic Waste and natural Fibers*" in USA, Canada, India and Korea and the national designation of the international trademark No.1 658 736 in USA, Canada and India ("Assignee").

WHEREAS, under the terms of that certain Operating Agreement of Pioonier Group, LLC (the "Agreement") dated as of the Effective Date, Assignors have conveyed, transferred, assigned, and delivered to Assignee, among other assets, certain intellectual property assets of the Assignors as outlined in Exhibit 1, attached hereto, and has agreed to execute and deliver this Patent Assignment, for the purpose of recording the assignments with the United States Patent and Trademark Office and the corresponding patent offices, entities or agencies in any applicable jurisdiction (including any applicable foreign country).

NOW, THEREFORE, in accordance with the Agreement and in consideration of the promises and covenants contained herein and therein, the parties agree as follows:

1.      <u>Assignment</u>. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignors confirms that Assignors have irrevocably conveyed, transferred, assigned, and delivered to Assignee and, for greater certainty, to the full extent that Assignors have not done so previously, Assignors do hereby irrevocably convey, transfer, assign, and deliver to Assignee all of Assignors' rights, title, and interest in and to the following (the "Transferred Patent Assets"):

(a)      certain inventions, improvements and discoveries described and/or claimed in the patent documents set forth in Schedule 1 (the "Applications");

(b)      all national phase applications arising from the Applications;

(c)      all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, and renewals of the Applications;

(d)      the right to file counterparts to the Applications in all countries and regions, except those in the European Union;

(e)      the right to claim priority from the Applications in all countries and regions, except those in the European Union;

(f)      each and every additional application that claims any part of the Inventions;

(g)      each and every additional application that is in any way based on or claimed priority from or corresponds to the Applications;

(h)      all rights of Assignors accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, except those in the European Union

(i)      any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

(j)      any and all claims and causes of action based on any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2.      <u>Recordation and Further Actions</u>. Assignors hereby authorize the Commissioner for Patents in the United States Patent and Trademark Office and the officials of corresponding patent offices, entities or agencies in any applicable jurisdiction (including any applicable foreign country) to record and register this Patent Assignment upon request by Assignee. Following the date hereof, upon Assignee's reasonable request, Assignors shall take such reasonable steps and actions, and provide such reasonable cooperation and assistance to Assignee and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits,



assignments, powers of attorney, or other documents, as may be reasonably necessary to effect, evidence, or perfect the assignment of the Transferred Patent Assets to Assignee, or any assignee or successor thereto.

3.      Terms of the Operating Agreement of Pioonier Group, LLC. The parties hereto acknowledge and agree that this Patent Assignment is entered into pursuant to the Agreement, to which reference is made for a further statement of the rights and obligations of Assignor and Assignee with respect to the Transferred Patent Assets. The representations, warranties, covenants, agreements, and indemnities contained in the Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

4.      Successors and Assigns. This Assignment shall be binding and inure to the benefit of the Assignee and Assignor and their respective successors and assigns.

5.      Counterparts. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same.

IN WITNESS WHEREOF, the undersigned have caused this Assignment to be duly executed as of the Effective Date.

**ASSIGNOR:**
**Alexander Huwe**                                              **Reimund Dann**

_____                    _____

**ASSIGNEE:**
**Pioonier Group, LLC**

By: _____

Name: _____

Title: _____

**Agreed and Accepted.**
**Pioonier International**

_____

Name: _Reimund Dann_          **Alex Huwe**

Title: _General Manager_     **General Manager**

**<u>EXHIBIT 1</u>**
**<u>INTELLECTUAL PROPERTY</u>**

**<u>(see attached)</u>**

EXHIBIT  B

# Pioonier Group, LLC

## Written Consent for Action Taken By

## Majority-in-Interest of Members

Jason Bokor and Pioonier International OOD & Co. KD , representing a majority in interest of the members of Pioonier Group, LLC (hereinafter "Company") as of, January 31, 2024 hereby affirm the following facts and agree to take the following actions:

A)  Effective at 12:00 AM, Pacific Standard Time, on February 1, 2024, David Cohen shall be formally removed as Manager, President, and Chief Executive Officer of the Company; and

B)  Notwithstanding David Cohen's removal as a Manager, David Cohen shall continue to maintain his full membership interest, and be entitled to all rights, benefits, and obligations associated therewith.

It is so hereby agreed as of January 31, 2024

Jason Bokor, as Manager and Member of Pioonier Group, LLC

(45% interest)

Pioonier International OOD & Co. KD, Member of Pioonier Group, LLC

(10% interest)

By: Alexander Huwe, _____CEO_____

By: Reimund Dann, General Manager Pioonier International